CALIFORNIA *v.* ZOOK ET AL.

No. 355.   Argued February 8, 1949.—Decided April 25, 1949.

*John L. Bland* argued the cause for petitioner. With him on the brief was *Ray L. Chesebro*.

*DeWitt Morgan Manning* argued the cause for respondents. *Frank W. Woodhead* was on the brief.

MR. JUSTICE MURPHY delivered the opinion of the Court.

A California statute prohibits the sale or arrangement of any transportation over the public highways of the State if the transporting carrier has no permit from the Interstate Commerce Commission.[1] The federal Motor

---

[1] Calif. Stats. 1947, c. 1215, §§ 2, 4, pp. 2724, 2725, Deering's Calif. Penal Code (1947 Supp.), §§ 654.1, 654.3. The statute makes it criminal to sell transportation in a carrier which has failed to secure

Carrier Act has substantially the same provision.[2] The question is whether the state act as applied in this case is invalid in view of the federal act.

Respondents operate a travel bureau in Los Angeles, and receive commissions for arranging "share-expense" passenger transportation in automobiles. Owners of private cars desiring passengers for a trip register with respondents' agency, as do prospective passengers. State lines are crossed in many of the trips. Until 1942 the federal act specifically exempted such "casual, occasional, or reciprocal" transportation.[3] But in that year the Interstate Commerce Commission removed the exemption,[4] as the Motor Carrier Act empowered it to do.[5] Both the California and federal statutes now require respondents to sell transportation only in carriers having permits from the I. C. C.

Respondents were prosecuted under the state act. They admitted their unlawful activity, but demurred to the criminal complaint on the sole ground that the state statute entered an exclusive congressional domain. The trial court disagreed, and entered a judgment of con-

---

a permit from either the California Public Utilities Commission or the Interstate Commerce Commission of the United States. Our only concern is with the correspondence of state and federal legislation.

[2] 49 U. S. C. §§ 301, 303 (b) (see note 5, *infra*), 49 Stat. 543 *et seq.*, 54 Stat. 919, 921. The act is limited to carriers operating in interstate commerce. 49 U. S. C. § 302 (b).

[3] 49 U. S. C. § 303 (b) (9).

[4] When the transportation is arranged "by a third-party intermediary who engages in making such transactions for compensation or as a regular occupation or business." *Ex parte No. MC-35*, 33 M. C. C. 69, 81.

[5] The I. C. C. order was upheld by the District Court for the Northern District of Illinois in *Drake* v. *United States*, November 18, 1942 (see *Levin* v. *United States*, 3 Federal Carriers Cases (CCH) 2297). We affirmed. *Levin* v. *United States*, 319 U. S. 728.

viction, but the appellate court[6] upheld respondents' contention, and ordered the complaint dismissed. 87 Cal. App. 2d Supp. 921, 197 P. 2d 851. The case is here on certiorari, 335 U. S. 883.

Certain first principles are no longer in doubt. Whether as inference from congressional silence, or as a negative implication from the grant of power itself, when Congress has not specifically acted we have accepted the *Cooley* case's broad delineation of the areas of state and national power over interstate commerce. *Cooley* v. *Port Wardens,* 12 How. 299; *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761, 768. See Ribble, *State and National Power Over Commerce,* ch. 10. Absent congressional action, the familiar test is that of uniformity versus locality: if a case falls within an area in commerce thought to demand a uniform national rule, state action is struck down. If the activity is one of predominantly local interest, state action is sustained. More accurately, the question is whether the state interest is outweighed by a national interest in the unhampered operation of interstate commerce.

There is no longer any question that Congress can redefine the areas of local and national predominance, *Prudential Insurance Co.* v. *Benjamin,* 328 U. S. 408; *Southern Pacific Co.* v. *Arizona, supra,* at 769, despite theoretical inconsistency with the rationale of the Commerce Clause as a limitation in its own right. The words of the Clause—a grant of power—admit of no other result. When Congress enters the field by legislation, we try to discover to what extent it intended to exercise its power of redefinition; here we are closer to an intent that can be demonstrated with assurance, although we may em-

---

[6] The Appellate Department of the Superior Court of Los Angeles County, State of California. There is no further review in the state courts. Art. VI, §§ 4, 4b, Calif. Const.; *People* v. *Reed,* 13 Cal. App. 2d 39, 56 P. 2d 240.

ploy presumptions grounded in experience in doubtful cases.

But whether Congress has or has not expressed itself, the fundamental inquiry, broadly stated, is the same: does the state action conflict with national policy? The *Cooley* rule and its later application, *Southern Pacific Co.* v. *Arizona, supra,* the question of congressional "occupation of the field," and the search for conflict in the very terms of state and federal statutes are but three separate particularizations of this initial principle.

We restate the familiar because respondents would have us pronounce an additional rule: that when Congress has made specified activity unlawful, "coincidence is as ineffective as opposition," and state laws "aiding" enforcement are invalid. Respondents seem to argue that this is as fundamental as the rule of conflict with national authority, and that it rests upon wholly independent premises.

But respondents seize upon only one part of the familiar phrase in *Charleston & W. C. R. Co.* v. *Varnville Furniture Co.,* 237 U. S. 597, 604. We said that when "Congress has taken the particular subject-matter in hand coincidence is as ineffective as opposition . . . ." See also, *Pennsylvania R. Co.* v. *Public Service Comm'n,* 250 U. S. 566, 569; *Missouri P. R. Co.* v. *Porter,* 273 U. S. 341, 346. Respondents' argument assumes the stated premise—that Congress has "taken the particular subject-matter in hand," to the exclusion of state laws. The Court could not have intended to enunciate a mechanical rule, to be applied whatever the other circumstances indicating congressional intent. Neither the language nor the facts of the cases cited support an approach in such marked contrast with this Court's consistent decisional bases. The *Varnville* case struck down a South Carolina statute which had the effect of holding a connecting carrier liable for goods damaged in inter-

state commerce, when Congress had determined that the initial carrier should bear primary responsibility; the *Pennsylvania Railroad* case held invalid a state measure requiring a specified type of rear platform different from the detailed specifications of the Interstate Commerce Commission; and in the *Porter* case, the Court thought Congress intended to leave the terms of a uniform bill of lading to the I. C. C., and that state laws on the subject were meant to be ineffective. See *Cloverleaf Butter Co.* v. *Patterson,* 315 U. S. 148, 157–159.

The "coincidence" rationale is only an application of the first principle of conflict with national policy. The phrase itself simply states that familiar rule. If state laws on commerce are identical with those of Congress, the Court may find congressional motive to exclude the states: Congress has provided certain limited penalties, "and a state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go," *Varnville, supra,* at 604—that is, if Congress has "occupied the field." But the fact of identity does not mean the automatic invalidity of state measures. Coincidence is only one factor in a complicated pattern of facts guiding us to congressional intent.[7] As the Court

---

[7] Compare *Missouri, K. & T. R. Co.* v. *Harris,* 234 U. S. 412, with *Northern P. R. Co.* v. *Washington,* 222 U. S. 370; *People* v. *Compagnie Générale Transatlantique,* 107 U. S. 59, 63; *Oregon-Washington R. & Nav. Co.* v. *Washington,* 270 U. S. 87; and *Cloverleaf Butter Co.* v. *Patterson,* 315 U. S. 148. In these cases we made our decision concerning congressional intent by considering all the factors we considered relevant. We did not resort to a mechanical rule.

The text also seems to supply the underlying rationale for the two cases cited in *Varnville,* at 604, to support the familiar quotation on "coincidence." *Southern R. Co.* v. *Railroad Comm'n,* 236 U. S. 439, and *Chicago, R. I. & P. R. Co.* v. *Hardwick Farmers Elevator Co.,* 226 U. S. 426. And see *Jerome* v. *United States,* 318 U. S. 101, 105.

stated in the *Pennsylvania Railroad* case, at 569, the "question whether Congress and its commissions acting under it have so far exercised the exclusive jurisdiction that belongs to it as to exclude the State, must be answered by a judgment upon the particular case." Statements concerning the "exclusive jurisdiction" of Congress beg the only controversial question: whether Congress intended to make its jurisdiction exclusive.

This has long been settled. *Fox* v. *Ohio*, 5 How. 410, announced uncertainly what *United States* v. *Marigold*, 9 How. 560, later made clear: that "the same act might, as to its character and tendencies, and the consequences it involved, constitute an offence against both the State and Federal governments, and might draw to its commission the penalties denounced by either, as appropriate to its character in reference to each." 9 How. at 569.[8] See *Ex parte Siebold*, 100 U. S. 371, 390; *United States* v. *Lanza*, 260 U. S. 377, 384. And see *Union Brokerage Co.* v. *Jensen*, 322 U. S. 202, 208.

*Asbell* v. *Kansas*, 209 U. S. 251, is a further illustration. A Kansas statute provided criminal penalties for the importation of cattle from any point south of the State, except for immediate slaughter, without approval of the proper state officials or the Bureau of Animal Industry of the United States. The congressional Act, 32 Stat. 791, 792, allowed cattle to be transported into a state if inspected and passed by an inspector of the United States Bureau of Animal Industry. Violation of the federal act brought criminal sanctions. Yet we affirmed a conviction under the state law. We said that "if the state law conflicts with it [federal law] the state law must yield. But the law of Kansas now before us recognizes the supremacy of the national law and conforms to it."

---

[8] The *Fox* and *Marigold* cases were concerned with congressional power over forgeries, but for the purposes of this case the principle is the same.

209 U. S. at 258.   And see the similar problem and similar answer by Brandeis, J., for the Court in *Dickson* v. *Uhlmann Grain Co.*, 288 U. S. 188.

To limit our inquiry to respondents' single standard would restrict us to unreality.   For Congress is often explicit when it wishes state laws to conclude federal prosecution, to avoid the double punishment possible in a federal system.   See, for example, 18 U. S. C. § 659, defining the crime of stealing from an interstate carrier; 18 U. S. C. § 660, misapplication of funds by an officer or employee of a carrier engaged in commerce.   And when state enforcement mechanisms so helpful to federal officials are to be excluded, Congress may say so, as in the Labor Management Relations Act, 1947, 29 U. S. C. (Supp. I), § 160 (a).   That Congress has specifically saved state laws in some instances, see, *e. g.,* the Securities Act of 1933, 15 U. S. C. § 77r, indicates no general policy save clarity.

Respondents' automatic "coincidence means invalidity" theory, applied in an area as imbued with the state's interest as is this one, see *infra*, would lead us to the conclusion that a state may not make a dealer in perishable agricultural commodities respect its laws on the fraudulent nonpayment of an obligation, if that fraud occurred after an interstate shipment, 7 U. S. C. § 499b (4), for Congress has not expressly saved such prosecutions.   We would hold, too, that extortion or robbery from interstate commerce under 18 U. S. C. § 1951 or 18 U. S. C. § 2117 is immune from state action; that the wrecking of a bridge over an interstate railroad is an "exclusively federal" offense, 18 U. S. C. § 1992; that the transmittal of a ransom note in interstate commerce cannot be punished by local authorities, 18 U. S. C. § 875.   And see 18 U. S. C. §§ 331, 472, 479.   In short, we would be setting aside great numbers of state statutes to satisfy a congressional purpose which would be only the product of this Court's

imagination. We cannot agree that each of the problems under the statutes cited may not be resolved by examination of the whole case.

. The question is whether Congress intended to override state laws identical with its own when it, through the Interstate Commerce Commission, regulated share-expense passenger automobile transportation, or whether it intended to let state laws stand. While the statute says nothing expressly on this point and we are aided by no legislative history directly in point,[9] we know that normally congressional purpose to displace local laws must be clearly manifested. *H. P. Welch Co.* v. *New Hampshire,* 306 U. S. 79, and cases cited; *Maurer* v. *Hamilton,* 309 U. S. 598, 614; *Kelly* v. *Washington,* 302 U. S. 1, 11, 14; *Mintz* v. *Baldwin,* 289 U. S. 346. Or if the claim is conflict in terms, it "must be clear that the federal provisions are inconsistent with those of the state to justify the thwarting of state regulation." *Cloverleaf Butter Co.* v. *Patterson, supra,* at 156. See also *Hines* v. *Davidowitz,* 312 U. S. 52, at 67.

General propositions derived from the whole sweep of the Commerce Clause are often helpful, and we think those just stated are persuasive indications of congressional intent in the case now before us. But the

---

[9] As might be expected: there was an exemption of casual operations when the statute was passed. See note 5, *supra,* and text. Discussion in debate and hearings is largely descriptive. See, *e. g.,* Hearings before Subcommittee of House Committee on Interstate and Foreign Commerce on H. R. 5262 and H. R. 6016, 74th Cong., 1st Sess., pp. 47, 97, 183, 188–191, 208, 262; Hearings before Senate Committee on Interstate Commerce on S. 1629, S. 1632, and S. 1635, 74th Cong., 1st Sess., pp. 69, 70, 87, 97, 119, 186–188, 215, 390. The Committee reports are not helpful.

There is, however, an expression of deference to state action on intrastate commerce, 49 U. S. C. § 302 (b), as strengthened on the floor of the Senate, 79 Cong. Rec. 5735–5737. See 79 Cong. Rec. 12197; 49 U. S. C. § 305 (a).

quite separate Commerce Clause degree questions can be resolved only by careful scrutiny of the particular activity regulated. The Interstate Commerce Commission found these dangers present in the business of share-expense passenger transportation: abandonment of passengers before reaching the promised destination; personal injuries sustained by passengers because of irresponsible drivers, with attendant delay and expense; delays caused by arrest and detention of drivers for violations of traffic laws; crowded conditions in automobiles by reason of an excessive number of passengers and their baggage; and "annoyance, anxiety, or fright caused by reckless and improper driving by the automobile operators, by the bad mechanical condition of the vehicles used, by the fatigue of drivers operating the automobiles for long periods without adequate rest, or by the improper conduct of the drivers or other passengers." Evidence of these evils led the I. C. C. to remove the exemption which had covered these respondents. *Ex parte No. MC–35*, 33 M. C. C. 69, 73, 74. See also Report of Federal Coordinator of Transportation on the Regulation of Transportation Agencies other than Railroads and on Proposed Changes in Railroad Regulation (Washington, 1934), Sen. Doc. 152, 73d Cong., 2d Sess., p. 226, mentioning the financial irresponsibility of these carriers. And see *California* v. *Thompson*, 313 U. S. 109.

Of course we no longer limit the states to their "traditional" police powers in considering a statute's validity under the Fourteenth Amendment. See *Lincoln Federal Labor Union* v. *Northwestern Iron & Metal Co.*, 335 U. S. 525. But the tradition of "usual police powers" is still of aid in determining congressional intent to exclude state action on interstate commerce, at least when Congress has legislated. Many of the evils discussed by the I. C. C., above, are of the oldest within the ambit of the police power: protection against fraud and physical harm to a

state's residents. And consistent with the many cases giving the state's interest in its own highways more weight than the national interest against "burdening" commerce,[10] we have held that the highway regulation involved in this case is allowable state action before Congress acted. *California* v. *Thompson, supra*. Removal of the Motor Carrier Act's exemption since the *Thompson* case does not change our conclusion.

The case would be different if there were conflict in the provisions of the federal and California statutes. But there is no conflict in terms, and no possibility of such conflict, for the state statute makes federal law its own in this particular. The case might also be different were there variegated state laws on this subject in 1941, when the I. C. C. removed the federal exemption. We might then infer congressional purpose to displace local laws and establish a uniform rule beyond which states may not go. See *Southern R. Co.* v. *Railroad Commission*, 236 U. S. 439. Whatever the result in that class of cases, it would be startling to discover congressional intention to "displace" state laws when there were no state laws to displace when Congress acted. And that is nearly the situation in the present case. When the I. C. C. removed the federal exemption, it mentioned twelve cities, other than Los Angeles and San Francisco, in which the problem was particularly acute.[11] Of these twelve

---

[10] E. g., *South Carolina State Highway Dept.* v. *Barnwell Bros.*, 303 U. S. 177; *Clark* v. *Poor*, 274 U. S. 554, 557; *Maurer* v. *Hamilton*, 309 U. S. 598, 614; *Hendrick* v. *Maryland*, 235 U. S. 610; *H. P. Welch Co.* v. *New Hampshire*, 306 U. S. 79; *Kelly* v. *Washington*, 302 U. S. 1, 10. See the distinction of *Buck* v. *Kuykendall*, 267 U. S. 307, and *Bush & Sons* v. *Maloy*, 267 U. S. 317, in *Bradley* v. *Public Utilities Commission*, 289 U. S. 92 at 95. See Kauper, *State Regulation of Interstate Motor Carriers*, 31 Mich. L. Rev. 920, 1097.

[11] "The travel-bureau business is quite extensive in many cities, particularly those in the western and southwestern States, notably at Kansas City, Mo., Wichita, Kans., Oklahoma City and Tulsa,

cities, only two were located in states which attempted regulation of the kind of transportation we are now considering.[12] Such striking absence of state law in states where the problem was recognized as serious by the I. C. C. clearly demonstrates a purpose to provide rather than displace local rules—to fill a void rather than nationalize a single rule. And we see nothing to show that a more serious problem in the State of California might not properly beget a more serious penalty, if the California legislature deemed it wise. I. C. C. recognition that the problem is more acute in some states than in others may well indicate acceptance of that proposition.

It is said that I. C. C. recognition of the difficulties facing state regulation of interstate commerce, 33 M. C. C. at 76, because of cases such as *Buck* v. *Kuykendall, supra,* is of importance here. But this case concerns only the state's mechanisms for enforcing a statute identical with that of the federal government, though rooted in different policy considerations. We cannot predicate exclusion upon the simple recognition of Constitutional difficulties not present in the cause before us. Since the

---

Okla., Dallas, Forth Worth, San Antonio, Houston, and El Paso, Tex., Los Angeles and San Francisco, Calif., Portland, Oreg., Seattle, Wash., and Denver, Colo. The record establishes that such operations exist at other cities, including Chicago, Ill., and New York, N. Y. At one time, there were approximately 50 bureaus in operation in Los Angeles alone. . . ." 33 M. C. C. at 71–72.

[12] Letters from motor carrier commissions in western and southwestern States show that in 1941 there was no regulation, or attempt at regulation, covering Kansas City, Oklahoma City, Tulsa, Dallas, Fort Worth, San Antonio, Houston, El Paso, Portland, or Seattle. Only in Wichita and Denver was regulation attempted, and its extent in Wichita is not at all clear.

In 1941 there was likewise no regulation or attempt at regulation of any kind in Arizona, Montana, New Mexico, or Utah, although Wyoming attempted some measure of control. Idaho's only requirement was a registration fee.

I. C. C. order was issued after *California* v. *Thompson,* one would expect the federal agency to be specific if it intended to supersede state laws. And we do not see how a previous California statute conflicting with I. C. C. policy, cf. 1933 Cal. Stat., c. 390, § 1, p. 1012, and *Frank Broker Application,* 8 M. C. C. 15, can have anything to do with the only California statute we are considering—a measure which does not conflict with I. C. C. policy. It is difficult to believe that the I. C. C. intended to deprive itself of effective aid from local officers experienced in the kind of enforcement necessary to combat this evil—aid of particular importance in view of the I. C. C.'s small staff. See 61st Annual Report of the I. C. C. (1947), p. 122; 62d Annual Report of the I. C. C. (1948), p. 109.[13]

This is not a hypothetical case on "normal Congressional intent." It is California's attempt to deal with a real danger to its residents. We know that coincidence, with its consequent possibility of double punishment, is an important factor to be considered. In many cases it may be a persuasive indication of congressional intent. But we must look at the whole case. In this case the factors indicating exclusion of state laws are of no consequence in the light of the small number of local regulations and the state's normal power to enforce safety and good-faith requirements for the use of its own highways.

---

[13] Respondents ignore practical differences when they rely upon the *Southern R. Co.* case, *supra,* which invalidated state regulation of grab-irons on railroad cars moving in interstate commerce. The individual state's interest in the manner its residents use its own highways can hardly be compared with the time-honored I. C. C. control over the nation's traditional avenues of interstate transportation, the railroads. A case closer to the one before us is *Asbell* v. *Kansas, supra.* To recognize that the question is one of degree does not resolve the sharp differences in extreme revealed by the *Southern R. Co.* case and the one now before us.

"The state and federal regulations here applicable have their separate spheres of operation." *Union Brokerage Co.* v. *Jensen, supra,* 322 U. S. at 208.[14]  So far as casual, occasional, or reciprocal transportation of passengers for hire is concerned, the State may punish as it has in the present case for the safety and welfare of its inhabitants; the nation may punish for the safety and welfare of interstate commerce.  There is no conflict.

*Reversed.*

MR. JUSTICE FRANKFURTER, dissenting.

My brother BURTON has set forth in convincing detail how the regulation of "travel bureaus" for arranging transportation of passengers by motor carriers engaged in interstate commerce was taken over by federal authority, after experience had disclosed the inadequacy of State regulation.  What I have to say only serves to emphasize my agreement with his conclusion.

In *California* v. *Thompson,* 313 U. S. 109, this Court recognized that positive intervention of Congress was required to displace the reserve power of the State to promote safety and honesty in the business of arranging for motor carrier transportation even beyond State lines.  As to such business the power of Congress to regulate commerce "among the several States" was an excluding, not an exclusive, power—State action was not barred by the Commerce Clause but only by appropriate congressional action.  State action is displaced only to the extent that Congress chooses to displace it.  One would suppose that, when Congress has proscribed defined conduct and attached specific consequences to violations of such out-

---

[14] "The Federal Government has dealt with the manner in which the customhouse brokerage is carried on.  Minnesota, however, is legitimately concerned with safeguarding the interests of its own people . . . ."  *Id.*

lawry, the States were no longer free to impose additional or different consequences by making the same misconduct also a State offense. And that is this case.

For the first time in the hundred and twenty-five years since the problem of determining when State regulation has been displaced by federal enactment came before this Court, *Gibbons* v. *Ogden,* 9 Wheat. 1, the Court today decides that the States can impose an additional punishment for a federal offense unless Congress in so many words forbids the States to do it. When Congress deals with a specific evil in a specific way, subject to specified sanctions, it is not reasonable to require Congress to add, "and hereafter the States may not also punish for this very offense," to preclude the States from outlawing the same specific evil under different sanctions.[1] To do so would impute to Congress the purpose of imposing upon a nationwide rule the crazy-quilt of diversity—actual or potential—in State legislation, when the federal policy was adopted by Congress precisely because it concluded that the manner in which the States, under their permissive power, dealt with the evil was unsatisfactory.

---

[1] The variety of sanctions now enforceable is reflected in the following statutes:

*United States:* fine of not more than $100 for the first offense and not more than $500 for any subsequent offense. 49 Stat. 564, 49 U. S. C. § 322 (a).

*California:* fine of not over $250 or imprisonment for not over 90 days or both, and on the second conviction, imprisonment for not less than 30 days or more than 180 days. For subsequent convictions, imprisonment for not less than 90 days and not more than one year. Cal. Pen. Code § 654.3 (Deering, 1947 Supp.).

*Washington:* fine of not over $250 or not over 90 days in jail; apparently additional offenses do not increase the punishment. Wash. Rev. Stat. Ann. § 2266 (1940), §§ 6397–19, 6397–20 (1941 Supp.).

*Wyoming:* fine of not less than $25, nor more than $100, or imprisonment for not more than six months or both. Wyoming Comp. Stat. Ann. §§ 60–1309, 60–1362 (1945). The applicability of these sections to a situation of the present type is not free from doubt.

Such an inference is a strained and strange way of interpreting the mind of Congress. It also disregards an important aspect of civil liberties, namely, avoidance of double punishment for the same act even though such double punishment may be constitutionally permissible. See *Jerome* v. *United States,* 318 U. S. 101, 105.

Of course the same physical act may offend a State policy and another policy of the United States. Assaulting a United States marshal would offend a State's policy against street brawls, but it may also be an obstruction to the administration of federal law. Scores of such instances, inevitable in a federal government, will readily suggest themselves. That was the kind of a situation presented by *United States* v. *Marigold,* 9 How. 560. Passing counterfeit currency may, in one aspect, be "a *private cheat* practised by one citizen of Ohio upon another," and therefore invoke a State's concern in "protecting her citizens against frauds," 9 How. 568, 569, but the same passing becomes of vital concern to the Federal Government because it tends to debase the currency. Such a situation is quite different from this case. It merits repetition to say that we are now reversing a State court for holding that the very same conduct for the disobedience of which federal regulation imposes a maximum fine of one hundred dollars for the first offense cannot be prosecuted in a State court under a State law imposing a larger fine and, perchance, a prison sentence.

The talk about "conflict" as a basis for displacing State by federal enactment is relevant only in situations where Congress has chosen to "circumscribe its regulation and occupy only a limited field," while State regulation is "outside that limited field," and yet an inference of negation of State action is sought to be drawn. See *Kelly* v. *Washington,* 302 U. S. 1, 10. Even in such circumstances this Court has drawn inferences of implied exclusion of

State action although in no sense of the word would there have been physical clash between State and federal regulation so as to preclude concurrence of vitality for both regulations. See, e. g., *Cloverleaf Butter Co.* v. *Patterson,* 315 U. S. 148; *Hill* v. *Florida,* 325 U. S. 538. In this case we have the very conduct theretofore left to State regulation taken over by federal regulation, and yet the Court superimposes upon the displacing federal regulation the State regulation which was consciously displaced. That a Court which only on April 4, 1949, decided *H. P. Hood & Sons* v. *Du Mond,* 336 U. S. 525, as it did, should now decide this case as it does, presents indeed a problem for reconciliation.

MR. JUSTICE BURTON, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE JACKSON join, dissenting.

The question presented is whether § 654.1 of the Penal Code of California [1] is invalid as applied in this case to interstate commerce by the Municipal Court of Los Angeles. The respondents, Zook and Craig, were convicted of making a sale, in 1948, in California, of interstate motor transportation to Texas, on an individual fare basis, over the public highways of California, under conditions whereby the transportation was to be supplied by a carrier having no certificate of convenience and necessity or other permit from the Public Utilities Commission of California, or from the Interstate Commerce Commission of the United States. Such a sale was adjudged contrary to the terms of § 654.1 but the Appellate Department of the Superior Court of California held that that Section was invalid as thus applied to interstate commerce in the face of the Interstate Commerce Act of the United States and of orders issued under the au-

---

[1] See Appendix A, *infra,* p. 776.

thority of that Act making precisely such a sale a federal offense. We agree with the court below that California could not, without the consent of Congress, lawfully thus share the exclusive jurisdiction being exercised by Congress to regulate commerce among the states and we find here no such consent. On the other hand, we do find here, under all the circumstances, that Congress has exercised its power of regulation of this precise form of interstate commerce to the exclusion of the states and in conflict with the regulation attempted here by the State of California.

From 1933 until 1947 the California legislation on this subject expressly distinguished between intrastate and interstate transportation. It provided that the state legislation was to be applicable to interstate motor carriers only "until such time as Congress of the United States shall act, . . ." [2] or in "the absence of action on the part of Congress or the Interstate Commerce Commission . . . ." [3] California thus recognized not only the possibility but the propriety of federal regulation of this form of commerce to the extent of its interstate operations. In 1935 [4] and in 1940 [5] Congress, on its part, expressly recognized a federal responsibility for such regulation. It assumed jurisdiction over the qualifications and maximum hours of service of employees and over safety of operations and standards of equipment. As to other regulations, Congress temporarily and conditionally exempted this kind of transportation from the Interstate

---

[2] 1933 Cal. Stat., c. 390, § 1, p. 1012.

[3] 1941 Cal. Stat., c. 539, § 2, p. 1863.

[4] § 203 (b), 49 Stat. 545–546, of the Motor Carrier Act, 1935, which became Part II, Interstate Commerce Act, 49 Stat. 543, 54 Stat. 919.

[5] § 203 (b) (9) of Part II, Interstate Commerce Act, 54 Stat. 921, 49 U. S. C. § 303 (b) (9). For text, see Appendix B (2), *infra*, p. 783.

Commerce Act. In doing so, however, it authorized the Interstate Commerce Commission to determine from time to time to what extent, if any, the exemption should be removed. In 1942, after a thorough study, that Commission largely removed the exemption.[6] Thus, by express authority of Congress, the regulation of the interstate operations of this type of transportation was vested in the Interstate Commerce Commission after a determination by that Commission that such an application of federal law was necessary to carry out the policy of Congress.

Section 654.1, which was added to the Penal Code of California in 1947, contained no provision distinguishing between intrastate and interstate commerce in this field. It mentioned only "transportation . . . over the public highways of the State of California . . . ." The state court below nevertheless interpreted the Section as seeking to include interstate as well as intrastate transportation and then held that it was invalid insofar as it applied to interstate transportation.[7] We accept the state court's

---

[6] *Ex parte No. MC–35,* 33 M. C. C. 69, 49 C. F. R., Cum. Supp. § 210.1.

[7] "The point made on appeal is that the acts charged and proved against defendants were done in interstate commerce and that for that reason and because of certain federal legislation, the state law cannot be applied to those acts. We find this contention well founded. . . .

. . . . .

"Respondent [The People of the State of California] concedes and even demonstrates that under the circumstances of this case the federal law and section 654.1, Penal Code, forbid and punish the same acts, but *contends* that this is permissible and does not *invalidate the state law, even as applicable to acts in interstate commerce.* If we look to the rule in California for determining whether a city ordinance is in conflict with a state law and for that reason void, the city being limited by our Constitution to such police regulations 'as do not conflict with general laws,' we find it established that

interpretation and the question before us is only the validity of the statute as applied to interstate transportation.[8] If it were not for the interpretation given to the California statute by the court below, the issue might be disposed of by limiting that statute, like its predecessor, to intrastate transportation.

---

'there is a conflict where the ordinance and the general law punish precisely the same acts.' . . . Respondent contends that this is not the rule applicable as between state and federal legislation, but on review of the authorities *we conclude that the rule in interstate commerce matters has substantially the same effect as that above stated.* Of such a case, the United States Supreme Court said long ago: 'This legislation [enacted by Congress] covers the same ground as the New York Statute, and they cannot co-exist.' (*New York* v. *Compagnie Generale Transatlantique* (1883), 107 U. S. 59, 63 [2 S. Ct. 87, 27 L. Ed. 383, 385].) . . .

· · · ·

"We conclude, therefore, that section 654.1, Penal Code, cannot be *validly* applied to transportation in interstate commerce, and since the complaint herein expressly limits itself to such transportation, it states no offense punishable under the section and the demurrer should have been sustained." (Emphasis added.) *People* v. *Zook*, 87 Cal. App. 2d Supp. 921, 922, 925, 197 P. 2d 851, 852, 854.

[8] *People* v. *Zook*, *supra*. The material statutory provisions include: The Penal Code of California, §§ 654.1–654.3, added by 1947 Cal. Stat. c. 1215, pp. 2723–2725. For text, see Appendix A, *infra*, p. 776. National Transportation Policy, inserted before Part I of the Interstate Commerce Act, 54 Stat. 899, 49 U. S. C., note preceding § 1. For text, see Appendix B (1), *infra*, p. 778. Part II, Interstate Commerce Act, §§ 202 (a), jurisdiction in Interstate Commerce Commission; 202 (b), powers of states; 203 (b) (9), partial and conditional exemption of casual and occasional transportation; 211 (a), licenses, certificates, permits; 222 (a), penalties; 49 Stat. 543, *et seq.*, as amended by 52 Stat. 1029, 1237, 54 Stat. 920, *et seq.*; 49 U. S. C. §§ 302 (a) and (b), 303 (b) (9), 311 (a), 322 (a). For text, see Appendix B (2), *infra*, p. 781. 49 C. F. R. Cum. Supp. § 210.1, as to removal of exemption as provided in § 203 (b) (9) of Part II, Interstate Commerce Act. For text, see note 23, *infra*, p. 770.

The complaint is printed in the margin.[9] Its sufficiency is the precise issue presented to us on the demurrer which the court below has ordered sustained. In that court, the respondents successfully asserted the invalidity of the state statute in the face of the Interstate Commerce Act applicable to the same offense. The petitioner concedes that the two laws sought to forbid and punish the same acts, but contends that this was a permissible duplication.

[9] "COMPLAINT—Filed January 8, 1948

"Personally appeared before me, this 8th day of January, 1948, E. W. Hively of Los Angeles City, who, first being duly sworn, complains and says: That on or about the 7th day of January, 1948, at and in Los Angeles City, in the County of Los Angeles, State of California, a misdemeanor, to-wit: Violation of Section 654.1 of the Penal Code of the State of California was committed by Berl B. Zook and Wilmer K. Craig (whose true name to affiant is unknown), who at the time and place last aforesaid, did wilfully and unlawfully, at 925 West 7th Street, in the City of Los Angeles, sell, and offer to sell, negotiated, provided and arranged for, and advertised and held themselves out as persons who sell and offer to sell and negotiate, provide and arrange for the transportation of persons on an individual fare basis over the public highways of the State of California by a carrier other than a carrier having a valid and existing certificate of convenience and necessity or other valid and existing permit from the Public Utilities Commission of the State of California or from the Interstate Commerce Commission of the United States authorizing such holder of a certificate or other permit to provide such transportation of passengers in that the said Berl B. Zook and Wilmer K. Craig, held themselves out as persons willing to sell and negotiate for the above described transportation and sold to James A. Moss and Dorothy Mae Elbag, transportation from Los Angeles to Fort Worth, Texas, over a carrier which was not licensed in any manner by the State of California or the Interstate Commerce Commission to carry passengers for compensation or hire and negotiated for the sale of such transportation and arranged for such transportation.

"All of which is contrary to the form of the Statute in such cases made and provided, and against the peace and dignity of the People

Agreeing that the two statutes forbid the same acts, our first duty is to see how far this identity of legislative effect extends. Our remaining duty then is to determine whether the state law is valid in the face of the federal law on the same subject.

The substantial identity between the statutes ends with their definitions of the offense. Only the Federal Act requires a broker's license and the general exemptions from the respective Acts are in great conflict.[10] The penalties are substantially different.[11] For example,

---

of the State of California. Said Complainant therefore prays that a warrant may be issued for the arrest of said Defendant ...... ...... (whose true name ...... ...... to affiant is unknown) and that ...... ...... he ...... ...... may be dealt with according to law.

> "Subscribed and sworn to before me this 8th day of January, 1948, E. W. Hively.
> "Urban F. Emma, Clerk of the Municipal Court of Los Angeles City, in said County and State. By G. Lander (Seal.) Deputy Clerk.
> "[File endorsement omitted]
> "Issued by Ray L. Chesebro, City Attorney
> "By Boyd A. Taylor, Deputy City Attorney."

The respondents demurred to this complaint. The demurrer was overruled by the Municipal Court of the City of Los Angeles, California. The respondents, upon a stipulated statement of facts, were convicted and sentenced by that court. Their motion in arrest of judgment was denied. The Appellate Department of the Superior Court of the State of California, in and for the County of Los Angeles, reversed the judgment and remanded the cause to the Municipal Court with directions to sustain the demurrer. The appeal from the order in arrest of judgment was dismissed.

[10] Cf. § 654.2 of the Penal Code of California with § 203 (b) of the Interstate Commerce Act; see § 211 (a) as to broker's license and, generally, Appendices A and B, infra, pp. 776, 778. For a detailed juxtaposition of the conflict, see Appendix C, infra, p. 784.

[11] Under § 654.3 of the Penal Code of California, assuming this to be the respondents' first offense, each respondent was subject to a maximum fine of $250 or imprisonment for not over 30 days,

in the instant case each respondent was fined $150 more under the state law than would have been possible under the federal law for what apparently was a first offense under each Act. Under the state law the court also had an option to impose a jail sentence, whereas no such option would have been available to it under the federal law. The federal law also provided for a fine up to $500 for each offense after the first. Under the state law, convictions after the first were punishable solely by imprisonment. Accordingly, while the offense here charged was one which violated both the state and federal statutes, there was a substantial conflict between the sanctions available for the enforcement of those statutes. This conflict is by no means conclusive of this case but it is entitled to consideration as indicating the absence, rather than the presence, of an implied consent by the United States to the intrusion of the state law into the exclusive jurisdiction made available to the United States by the Federal Constitution. Prosecution and punishment under both the state and federal statutes would, in this instance, often result in greater punishment than the maximum permitted by the federal law. We cannot readily assume congressional consent to state legislation

---

or both. In the instant case the court fined each respondent $250 and required that, in default of the payment of the respective fines before 5 p. m. on the date of judgment, they were to be imprisoned in the city jail in the proportion of one day's imprisonment for each $2 of the fines until paid, not exceeding 125 days. For a second conviction the punishment prescribed is limited to imprisonment for not less than 30 days and not more than 180 days. Upon a third or subsequent conviction the punishment is limited to imprisonment for not less than 90 days and not more than one year, without eligibility for probation. Violations of the corresponding § 211 (a) of the Interstate Commerce Act are punishable, under § 222 (a), by a fine of not more than $100 for the first offense and not more than $500 for any subsequent offense. Each day of violation constitutes a separate offense.

that makes an expressly stated congressional "maximum" penalty no longer a maximum penalty.

The issue requires answers to two questions: I. Did the California Code invade the exclusive jurisdiction which Congress was exercising through its Interstate Commerce Act? II. If so, was the conviction under the California Code invalid on the ground that Congress had taken exclusive jurisdiction over that offense and had not consented to share its jurisdiction with California as here proposed? For the reasons to be stated, we believe the answer to each of those questions should be yes.

## I.

*The California Code invaded the exclusive jurisdiction which Congress was exercising through its Interstate Commerce Act.*

The petitioner's concession that the respondents' acts simultaneously violated the terms of both statutes sharply distinguishes the issue here from those often presented in this general field of controversy. (1) We do not have here the much litigated issue as to the validity of state statutes prohibiting or otherwise regulating acts committed in the course of interstate commerce but in a field of that commerce where Congress has taken no action. In the instant case, Congress has taken jurisdiction by statute not only in this general field but over the precise type of interstate motor carrier transportation of passengers that is the subject of the state legislation and of the complaint in this case. (2) Similarly, we do not have here a case where a state has applied its prohibitory or otherwise regulatory measures to some intrastate transaction taking place before or after, and separable from, the transactions in interstate commerce over which the Federal Government has taken jurisdiction. (3) We

do not have here an attempt by a state to supplement federal control over some activity related to but not specifically covered by the federal legislation. (4) Also, we do not have here a case where Congress has expressly consented to share with the states the plenary and supreme authority of Congress to take jurisdiction over the regulation of the interstate commerce in question. (5) On the other hand, we do have here the significant situation of a state attempting, by a new state law, to reach and punish, additionally, a transaction in interstate commerce in the face of the active exercise of substantially conflicting federal jurisdiction over the same transaction and in the absence of express congressional consent to such attempted duplication of jurisdiction. This is in contrast to an attempt by a state to help enforce, as such, an already existing federal statute covering the offense.

We start not merely with the inherent right of a state to exercise its police power over acts within its jurisdiction. We start also with the constitutional provisions by which the supreme legislative power of the respective states has been delegated to Congress to regulate interstate commerce.[12]

Once Congress has lawfully exercised its legislative supremacy in one of its allotted fields and has not accompanied that exercise with an indication of its consent to share it with the states, the burden of overcoming the supremacy of the federal law in that field is upon any state seeking to do so.

---

[12] "The Congress shall have Power . . . To regulate Commerce . . . among the several States; . . . ." (U. S. Const. Art. I, § 8.)

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (*Id.* Art. VI.)

750

An early statement of the general principle involved was made by Mr. Justice Story in *Prigg* v. *Pennsylvania,* 16 Pet. 539, 617–618.[13] That statement was approved and enlarged upon by Mr. Justice J. R. Lamar in *Southern R. Co.* v. *Railroad Comm'n of Indiana,* 236 U. S. 439, in a case arising under the Interstate Commerce Act in which, on reasoning applicable in the instant case, an Indiana statute was held invalid because it required handholds on the sides or ends of railroad cars operating in interstate commerce in Indiana in substantial duplication of the Federal Safety Appliance Act requiring handholds on both the sides and ends of such cars. There Mr. Justice Lamar said:

> "But the principle that the offender may, for one act, be prosecuted in two jurisdictions has no application where one of the governments has exclusive

---

[13] ". . . it would seem, upon just principles of construction, that the legislation of Congress, if constitutional, must supersede all state legislation upon the same subject; and by necessary implication prohibit it. For if Congress have a constitutional power to regulate a particular subject, and they do actually regulate it in a given manner, and in a certain form, it cannot be that the state legislatures have a right to interfere; and, as it were, by way of complement to the legislation of Congress, to prescribe additional regulations, and what they may deem auxiliary provisions for the same purpose. In such a case, the legislation of Congress, in what it does prescribe, manifestly indicates that it does not intend that there shall be any farther legislation to act upon the subject-matter. Its silence as to what it does not do, is as expressive of what its intention is as the direct provisions made by it. This doctrine was fully recognised by this Court, in the case of Houston *v.* Moore, 5 Wheat. Rep. 1, 21, 22; where it was expressly held, that where Congress have exercised a power over a particular subject given them by the Constitution, it is not competent for state legislation to add to the provisions of Congress upon that subject; for that the will of Congress upon the whole subject is as clearly established by what it had not declared, as by what it has expressed." *Id.* at pp. 617–618.

jurisdiction of the subject-matter and therefore the exclusive power to punish. Such is the case here where Congress, in the exercise of its power to regulate interstate commerce, has legislated as to the appliances with which certain instrumentalities of that commerce must be furnished in order to secure the safety of employés. Until Congress entered that field the States could legislate as to equipment in such manner as to incidentally affect without burdening interstate commerce. But Congress could pass the Safety Appliance Act only because of the fact that the equipment of cars moving on interstate roads was a regulation of interstate commerce. Under the Constitution the nature of that power is such that when exercised it is exclusive, and *ipso facto,* supersedes existing state legislation on the same subject. Congress of course could have 'circumscribed its regulations' so as to occupy a limited field. *Savage* v. *Jones,* 225 U. S. 501, 533. *Atlantic Line* v. *Georgia,* 234 U. S. 280, 293. But so far as it did legislate, the exclusive effect of the Safety Appliance Act did not relate merely to details of the statute and the penalties it imposed, but extended to the whole subject of equipping cars with appliances intended for the protection of employés. *The States thereafter could not legislate so as to require greater or less or different equipment; nor could they punish by imposing greater or less or different penalties. . . .*

*"The test, however, is not whether the state legislation is in conflict with the details of the Federal law or supplements it, but whether the State had any jurisdiction of a subject over which Congress had exerted its exclusive control."* (Emphasis added.) *Id.* at pp. 446, 448.

Mr. Justice Holmes said in *Charleston & W. Car. R. Co.* v. *Varnville Co.*, 237 U. S. 597, 604:

> "When Congress has taken the particular subject-matter in hand coincidence is as ineffective as opposition, and a state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go."

Mr. Justice Butler reemphasized this in sweeping terms in *Missouri Pac. R. Co.* v. *Porter*, 273 U. S. 341, 346, by concluding the opinion of the Court as follows:

> "Its [Congress'] power to regulate such [interstate] commerce and all its instrumentalities is supreme; and, as that power has been exerted, state laws have no application. *They cannot be applied in coincidence with, as complementary to or as in opposition to, federal enactments which disclose the intention of Congress to enter a field of regulation that is within its jurisdiction.*" (Emphasis added.)

See also, *Erie R. Co.* v. *New York*, 233 U. S. 671, 683; *Second Employers' Liability Cases*, 223 U. S. 1, 55.

Related to this exclusive jurisdiction of Congress, established by Article VI of the Constitution, is the general policy against subjecting anyone to punishment more than once for the commission of a single act. Unless care is taken to prevent this, such double punishment may result from the overlapping of the federal and state jurisdictions. However, its unfairness to the individual, as well as its cumbersomeness for enforcement purposes, suggests that it should not be read into legislation in the absence of clear language demonstrating a purpose to permit it. In a case which related to the interpretation of a federal statute that might duplicate or build upon a state law, this Court said:

> " . . . it should be noted that the double jeopardy provision of the Fifth Amendment does not stand as a bar to federal prosecution though a state convic-

tion based on the same acts has already been obtained. . . . That consideration gives additional weight to the view that where Congress is creating offenses which duplicate or build upon state law, courts should be reluctant to expand the defined offenses beyond the clear requirements of the terms of the statute." *Jerome* v. *United States,* 318 U. S. 101, 105.

So here we should be reluctant to read into a federal statute congressional consent to state legislation which authorized prosecution and punishment by the State in addition to federal prosecution and punishment.

Where there is legislative intent to share the exclusiveness of the congressional jurisdiction, appropriate language can make that intent clear. An outstanding example of such authorization is in the Eighteenth Amendment, now repealed. It was there provided that "The Congress and the several States shall have concurrent power to enforce this article by appropriate legislation." (U. S. Const.) More recently, clear language was used by Congress to insure the validity of state cooperation in the "Migratory Bird Conservation Act," approved February 18, 1929:

"SEC. 17. That when any State shall, by suitable legislation, make provision adequately to enforce the provisions of this Act and all regulations promulgated thereunder, the Secretary of Agriculture may so certify, and then and thereafter said State may cooperate with the Secretary of Agriculture in the enforcement of this Act and the regulations thereunder." 45 Stat. 1225, 16 U. S. C. § 715p.

Still closer to the present situation is the language used by the Congress that passed the Motor Carrier Act, 1935. In "The Whaling Treaty Act" it said:

"SEC. 12. That nothing in this Act shall be construed to prevent the several States and Territories

from making or enforcing laws or regulations not inconsistent with the provisions of said Convention [for the regulation of whaling] or of this Act, or from making or enforcing laws or regulations which shall give further protection to whales . . . ." 49 Stat. 1248, 16 U. S. C. § 912.[14]

The Motor Carrier Act, 1935, did not overlook the subject of exclusive state and federal jurisdiction over the respective fields of intrastate and interstate commerce touched by the Act. It did not, however, approve joint and conflicting control by both at the same time. *It expressly vested in the Interstate Commerce Commission*

---

[14] The constitutional principle of the supremacy of federal jurisdiction here discussed puts a limitation upon the legislative jurisdiction of the states in the absence of congressional consent. It does not restrict cooperation of the states in the enforcement of federal statutes. Such cooperation, for example, is an appropriate accompaniment of the National Transportation Policy under the Interstate Commerce Act. This cooperation does not, however, require the creation of separate state offenses paralleling or nearly paralleling the federal offenses. It calls, rather, for cooperation in enforcing the existing federal offenses.

The petitioner, in aid of its argument, has pointed to the declaration of policy as originally stated in the Motor Carrier Act, 1935. There is no aid for the petitioner there. That declaration contained the general phrase, "It is hereby declared to be the policy of Congress to . . . cooperate with the several States and the duly authorized officials thereof and with any organization of motor carriers in the administration and enforcement of this part." 49 Stat. 543. For full text, see Appendix B (1), *infra,* p. 778. When this declaration was repealed in 1940 and largely incorporated in a statement of the "National Transportation Policy," preceding Part I of the Interstate Commerce Act, Congress added language emphasizing the federal rather than the state features of the policy. The material clauses then read:

"It is hereby declared to be the national transportation policy of the Congress . . . to cooperate with the several States and the duly authorized officials thereof; . . . all to the end of developing, coordinating, and preserving a national transportation system by

*the regulation of the transportation of passengers by mo-
tor carriers engaged in interstate commerce.* With equal
clarity it expressly provided that Part II of the Interstate
Commerce Act *should not affect the powers of taxation
of the several states.* It thus dealt with and preserved
to the states their full powers to tax without added re-
striction because of the Motor Carrier Act's relation to
interstate commerce. The state powers of taxation were
thus distinguished from those of regulation because the
power of regulation of interstate commerce was vested
expressly in the Interstate Commerce Commission. Also,
in relation to the regulation of intrastate commerce, Con-
gress provided that nothing in Part II of the Interstate
Commerce Act "shall be construed . . . to authorize a
motor carrier to do an intrastate business on the highways
of any State, or to interfere with the *exclusive exercise
by each State of the power of regulation of intrastate
commerce by motor carriers on the highways thereof.*"
(Emphasis added.) § 202 (c), 49 Stat. 543, later des-
ignated § 202 (b), 54 Stat. 920, 49 U. S. C. § 302 (b). For
full text of original § 202 (b) and (c), later designated
§ 202 (a) and (b), see Appendix B (2), *infra,* p. 781.

Congress thus dealt directly with the problem of state
and federal regulation of motor carrier transportation,
either interstate or intrastate in character. Congress in-
dicated no consent to share with others its exclusive ju-
risdiction over the regulation of interstate commerce. If

water, highway, and rail, as well as other means, adequate to meet
the needs of the commerce of the United States, of the Postal Service,
and of the national defense. . . ." 54 Stat. 899. For full text and
comment, see Appendix B (1), *infra,* p. 778.

It was because the Commission, in 1942, found it necessary in
order to carry out this National Transportation Policy that it with-
drew the exemption in § 203 (b) (9) which is now before us and
which theretofore, to a large extent, had kept interstate travel
bureaus and interstate share-the-expense operators exempt from the
Interstate Commerce Act.

it had intended to do so, that would have been the place
to express such an intent. The language used reflected
not merely an absence of congressional consent to the
sharing of its jurisdiction over any form of interstate com-
merce. On the contrary, especially when read with § 203
(b) (9), it evidenced a conscious congressional dissent
from any such sharing of its jurisdiction over this form
of interstate commerce described in this legislation. Sec-
tion 203 (b) (9) stated a positive insistence upon federal
jurisdiction in the precise field which concerns us here.
It provided that the federal jurisdiction become effective
whenever and to the extent that the Interstate Commerce
Commission found the necessity for it. In this narrow
field, Congress thus expressly left temporarily on trial the
substantially exclusive state regulation of interstate com-
merce which was already in effect. This express tempo-
rary conditional exemption created a special situation in
which the consent of Congress to state regulation was to
be continued or cut off by the Interstate Commerce Com-
mission. It did not suggest any sharing or duplication
of control by the Commission and the state. This tem-
porary survival of state control was expressly and un-
equivocally terminated by the order of the Interstate
Commerce Commission in 1942. That order called for a
positive discontinuance of state control, coupled with a
positive vesting of jurisdiction in the Interstate Com-
merce Commission over this particular type of interstate
commerce. The procedure thus taken to substitute fed-
eral for state regulation of interstate commerce was the
very opposite of a procedure permissive of joint or dupli-
cating federal and state control. It is difficult to con-
ceive of a more deliberate and obvious substitution of
one for the other. The area available for such substitu-
tion of federal for state control was clearly defined and
set aside in § 203 (b) (9) and then put into effect by

order of the Interstate Commerce Commission. *Ex parte No. 35,* 33 M. C. C. 69, 49 C. F. R. Cum. Supp. § 210.1. For an example of a substitution of exclusive federal regulation for exclusive state regulation of certain interstate commerce activities in the warehousing field, see *Rice* v. *Santa Fe Elevator Corp.,* 331 U. S. 218.

This brings us to the final question of statutory interpretation. Did Congress impliedly consent to this attempted sharing of its established jurisdiction within the narrow limits of § 203 (b) (9)?

## II.

*The conviction under the California Code was invalid because Congress had taken exclusive jurisdiction over that offense and had not consented to share its jurisdiction with California.*

It is a contradiction in terms to say that a state, without the consent of Congress, may duplicate or share in the exclusive jurisdiction of Congress. If the jurisdiction of Congress has become exclusive, the state's jurisdiction must, by hypothesis, be derived thereafter from Congress or cease to exist. In this case there was *no express consent* by Congress to share with the states the federally protected exclusive jurisdiction over this type of transaction in interstate commerce. The question remains, however, whether, under all the circumstances, Congress shall be held to have impliedly consented to share its exclusive jurisdiction with California. The text of the legislation and the course of events, which led the Federal Government to take jurisdiction, not only disclose an absence of any basis for a claim that Congress impliedly consented to the California legislation but present overwhelming evidence of a deliberate, careful and unconditional assumption by Congress of federal juris-

diction, *consciously exclusive* of the inadequate state regulation theretofore found to exist. See the reference, *supra,* to original § 202 (b) and (c) of the Act dealing with the jurisdiction of the Interstate Commerce Commission and of the states. For full text, see § 202 (a) and (b) in Appendix B (2), *infra,* p. 781. In addition, we shall now consider in detail the action taken under the informed guidance of the Interstate Commerce Commission in accordance with the express terms of § 203 (b).

The precise fundamental issue is not the identity, similarity, diversity, or even repugnance, of the two statutes. The fundamental issue is that of the presence or absence of congressional consent to the sharing of its exclusive jurisdiction. The degree of immediate or potential conflict between the statutes has a material relation to the issue of congressional consent. Clear conflict between the statutes would be practically conclusive against the state. The less the conflict, the less obvious is the basis for the objection of Congress to sharing its jurisdiction with the state. However, even a complete absence of conflict, resulting in a mere duplication of offenses, would not remove all basis for objection and would not necessarily establish the required congressional consent. For example, the inherent objectionability of the double punishment of an offender for a single act always argues against its implied authorization. Similarly, the difficulties inherent in diverse legislative and enforcement policies always argue against the introduction of new state offenses, as distinguished from state cooperation in prosecuting existing federal offenses. Here there was substantial potential conflict between the prescribed state penalties and the federal penalties, although the prohibited acts were the same. Likewise, there was a substantial difference between the two statutes in the exceptions to their application and in such related provisions

as those for the licensing of the travel bureaus as distinguished from the carriers. Furthermore, § 203 (b) expressly left it to the Interstate Commerce Commission to determine the extent, if any, to which the federal jurisdiction should be applied.

In the instant case the most impressive material, emphasizing the unwillingness of Congress to share its exclusive control with a control through state legislation, is found in the legislative, administrative and judicial proceedings which led to the taking of complete jurisdiction by Congress. When federal jurisdiction was thus taken, in 1942, it was clear to Congress that there existed highly unsatisfactory state regulation of the interstate transactions in question. There is no evidence of a subsequent change in the attitude of Congress. The course of events tells the story. It suggests no consent by Congress to a duplication of federal and state control. On the other hand, it demonstrates the existence of ample reasons for taking and retaining exclusive federal jurisdiction over this kind of interstate transportation. It is an example of the effective integration of our federal and state jurisdictions when each is given exclusive control over designated activities, rather than simultaneous, dual and conflicting control over the same activities.

1. *June 5, 1931.*—A California statute was approved defining motor carrier transportation agents (comparable to travel bureaus arranging share-the-expense trips), and providing for the State's regulation, supervision and licensing of such agents. This Act referred expressly to transportation between points within California and to transportation to the border of that State when one of the points to be reached was outside the State. It expressly permitted these state-licensed transportation agencies to arrange for motor transportation by a motor carrier *not* holding a valid certificate of public conven-

ience and necessity issued by the Railroad Commission of California. In substance, the Act thus recognized and licensed travel bureaus arranging for share-the-expense interstate, as well as intrastate, motor trips by unlicensed carriers. 1931 Cal. Stat., c. 638, § 1, p. 1362, *et seq.*

2. *May 15, 1933.*—Another California statute repealed the Act of June 5, 1931. The new statute declared it to be the policy of California to regulate and control motor carrier transportation agents acting as "intermediaries between the public and those motor carriers of passengers operating, as common carriers or otherwise, over the public highways of the State, for compensation, that are not required by law to obtain, or that have not obtained, a certificate from the Railroad Commission of the State of California . . . ." 1933 Cal. Stat., c. 390, § 1, p. 1012. This statute, like that of 1931, recognized and prescribed licenses for the travel bureaus dealing in share-the-expense interstate, as well as intrastate, motor trips by unlicensed carriers. This statute and this declaration remained in effect until 1947. It was during this same time that the Interstate Commerce Commission, after investigation, declared that it found that such operations, at least as applied to interstate commerce, *were contrary to public policy.* The Commission's extended investigation resulted, in 1942, in the deliberate application of the Interstate Commerce Act to these interstate operations under express authority of Congress. The federal law thereupon expressly prohibited such transportation by unlicensed carriers, in interstate commerce, and also prohibited travel bureaus or brokers from selling or arranging such unlicensed trips in interstate commerce. The conflict in policy thus became clear, at least by 1942.

The relation of the 1933 California Act to interstate commerce and its conflict with the federal policy stated by the Interstate Commerce Commission is emphasized

by the foregoing declaration of state policy which remained in the State Act from 1933 until 1941: *"until such time as Congress of the United States shall act,* the public welfare requires such regulation and control of such intermediaries between the public and interstate motor carriers as well as between the public and intrastate motor carriers." (Emphasis added.) *Id.* at p. 1012.

The California Act also included, until 1941, the following: "The provision of this act shall apply regardless of whether such transportation so sold, or offered to be sold, is interstate or intrastate." *Id.* at p. 1013. In general, the Act amplified the plan of the 1931 Act. It required the bonding and licensing of motor carrier transportation agents (or travel bureaus) arranging for unlicensed interstate, as well as intrastate, motor carrier transportation. Both State Acts contained a section providing explicitly for the separability of any section, subsection, sentence, clause or phrase which might be held unconstitutional.

3. *August 9, 1935.*—Following an extended survey of the rapidly increasing volume of interstate motor transportation, the Motor Carrier Act, 1935, was enacted by Congress as Part II of the Interstate Commerce Act. For the purposes of this case, the most important feature of this Act was its provision for the partial and conditional exemption from its operation of the kind of motor carrier transportation here involved. Section 203 (b) (9) excluded from its operation, except for safety purposes, "the casual, occasional, or reciprocal transportation of passengers or property in interstate or foreign commerce for compensation by any person not engaged in transportation by motor vehicle as a regular occupation or business." 49 Stat. 546. This exclusion of casual and occasional motor carriers was only a conditional exemption, expressive of federal concern over the apparent inadequacy of the state control over casual and occasional

transportation involving interstate trips.   The condition applied to the exclusion was—

> "(b) Nothing in this part [Part II of the Interstate Commerce Act], . . . shall be construed to include . . . [clauses (1) to (7) incl.]; nor, *unless and to the extent that the [Interstate Commerce] Commission shall from time to time find that such application is necessary to carry out the policy of Congress enunciated in section 202,*[15] *shall the provisions of this part,* except the provisions of section 204 relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment *apply to:* (8) . . . or (9) . . . [casual, occasional or reciprocal transportation as quoted above]."   (Emphasis added.)   49 Stat. 545–546.

The close relation between the Commission, the policy of Congress enunciated in the Act and the federal control over the casual and occasional motor carrier transportation of passengers has been emphasized thus from the inception of the Motor Carrier Act, 1935, to the present.

This provision conditionally exempted from federal control not only the casual and occasional transportation service itself but, by rendering such transportation not "subject to" Part II of the Interstate Commerce Act, it also conditionally exempted, from the federal brokerage license requirements, the travel bureaus which sold or arranged for such casual and occasional unlicensed and unregulated interstate transportation.[16]

4. *June 14, 1938.—Frank Broker Application,* 8 M. C. C. 15.   Division 5 of the Interstate Commerce Commission made an important ruling on this application. February 11, 1936, the applicant, doing business as

---

[15] See Appendix B (1), *infra,* p. 779.

[16] § 211 (a), 49 Stat. 547, 49 U. S. C. § 311 (a).   For text, see Appendix B (2), *infra,* p. 783.

Frank's Travel Bureau, of Dallas, Texas, filed an application under § 211 of the Motor Carrier Act, 1935, for a broker's license for the purpose of arranging motor transportation of persons in interstate commerce. For five years the applicant had operated a "travel bureau" in Dallas, Texas. The nature of his business was to bring together persons desiring to travel from Dallas to any point as far west as Los Angeles, California, or as far east as New York, New York. The applicant also sold tickets, on a commission, for certain competing licensed motor carriers. The Commission held that it was necessary for the applicant to obtain a broker's license under the Federal Act in order to continue to sell tickets for the licensed carriers. The rest of the applicant's interstate business, however, was that of a typical travel bureau, arranging for transportation by unlicensed carriers. The Commission's opinion discussed this activity at length and reached a conclusion that throws light on the future policy of the Commission and on the future course of the federal and state legislation. It demonstrates that the Commission, when taking its stand against this type of interstate transportation, did so, at least in California, in the face of a contrary state policy which then favored the continuance, rather than the prohibition, of such operations. The Commission finally issued the broker's license *but only upon the express condition that the applicant would discontinue his travel bureau operations in arranging for the above-described unlicensed interstate transportation which the Commission found to be not in the public interest.* It said (pp. 19–20):

> "*The record convinces us that applicant's method of doing that portion of his business, namely the bringing together of prospective passengers and private individuals, not motor carriers, in order that they may enter into an arrangement whereby the passenger for compensation is transported in inter-*

764

*state or foreign commerce by the private individual, is not in the public interest.* Applicant's limited knowledge of the passenger and owner-driver, and his inability to secure authoritative information with respect to each, of necessity makes it impossible for him to safeguard the rights of either. As a result of this practice an unscrupulous passenger or owner-driver is given an opportunity to defraud honest citizens. Under section 204 (a) (4) of the act, we are authorized, among other things, to establish reasonable requirements with respect to the practices of a broker. We are of the opinion that *it is reasonable to require applicant to discontinue his practice of securing private individuals not engaged in business as carriers, to transport passengers for compensation in interstate or foreign commerce, and the license granted herein will be subject to this condition and limitation.*

"We find that applicant is fit, willing, and able to perform the brokerage service proposed and to conform to the provisions of the act and our requirements, rules, and regulations thereunder; that the proposed service, *subject to the condition and limitation stated in the next preceding paragraph, is consistent with the public interest and the policy declared in section 202 (a)*[17] *of the act;* and that a brokerage license should be issued to him." (Emphasis added.)

5. *February 6, 1939.—Michaux Broker Application,* 11 M. C. C. 317. Division 5 of the Interstate Commerce Commission denied this application, filed in June, 1936, for a broker's license under the Federal Act. The applicant sought to carry on an interstate travel bureau operation in Chicago. The Commission found that, if the

---

[17] See Appendix B (1), *infra,* p. 779.

operation were strictly limited to arrangements for inter-state transportation by casual or occasional carriers, "the transportation would not be subject to the act." (*Id.* at p. 318.) The applicant, accordingly, would not require a broker's license for that activity. The Commission, however, said (p. 318): "The extent of applicant's past operations gives rise to doubt that such a volume of business could be achieved without the employment of some persons regularly engaged in transportation of passengers by motor vehicle as an occupation." He disclaimed intention to engage in such operations in the future. The Commission thereupon denied his request for a broker's license for those operations because no such license was required for them. The Commission warned him of the penalties for unlawful operations and denied his application on the ground that he had "not shown that his operation as broker will be consistent with the public interest or with the policy declared in section 202 (a)[18] of the act, . . . ." (P. 318.) His operations as thus described and condemned were of a type comparable to those *previously condemned by the Commission in its decision on the Frank Broker Application, supra, but approved in California's statutory declaration of a contrary policy then in effect.*

6. *May 1, 1940, and May 17, 1940.*[19]—The Interstate Commerce Commission entered upon its important investigations known, respectively, as *Ex parte No. MC–35,* 33 M. C. C. 69, and *Ex parte No. 36,* 32 M. C. C. 267. The first was made—

"into the practices with respect to the casual, occasional, or reciprocal transportation of passengers in interstate or foreign commerce for compensation, for the purpose of determining whether the exemption

---

[18] See Appendix B (1), *infra,* p. 779.

[19] Orders directing investigations, 5 Fed. Reg. 1830, 1845.

of such transportation as provided in section 203 (b) (9) of the Interstate Commerce Act should be removed to the extent of making applicable all provisions of part II of the act to such transportation . . . [when sold under travel bureau practices]." *Ex parte No. MC–35*, 33 M. C. C. 69, 70.

The second was an investigation into the subject of rules and regulations to govern brokers of passenger transportation subject to Part II of the Interstate Commerce Act. The first investigation later disclosed, among other things, that the—

"Board of Public Utilities and Transportation of the city of Los Angeles during the latter part of 1939 and the early part of 1940 received an average of 8 complaints daily involving travel bureaus. At other cities, abandoned passengers, who were usually found to be without funds, were assisted by private or public charity. In general, the testimony of the witnesses for such organizations as better-business bureaus, and travelers' aid societies, based upon a knowledge acquired in the performance of their duties, corroborates that of passengers who testified with regard to the difficulties they encountered while traveling by means of transportation arranged through travel bureaus.

"The law-enforcement officials and representatives of eleemosynary and quasipublic organizations who testified favor the removal of the exemption in section 203 (b) (9) of the casual, occasional, and reciprocal transportation of passengers for compensation, when such transportation is arranged through travel bureaus, and believe that regulation by this Commission of such transportation is necessary. Their opinions are based principally on the grounds that this type of transportation as now conducted is the cause of inconvenience and hardship to the trav-

eling public using such transportation, for which adequate redress cannot be obtained, that numerous violations of State and local laws and regulations occur in connection therewith, *that State and local officials are unable properly to regulate such operations because of the fact that a large proportion of the transportation is interstate,* and that, because of the present practices in connection with such transportation, an unreasonable burden is placed upon private and public charities in caring for passengers abandoned or injured while traveling by this means of transportation." (Emphasis added.) *Id.* at pp. 75–76.

7. *September 18, 1940.*—Amendments were enacted to Part II, Interstate Commerce Act. Although the final report in *Ex parte No. MC–35* was not made until 1942, some of the conditions referred to above were reflected in an amendment made to § 203 (b) (9) in 1940.[20] Congress still left the casual transportation operations generally unlicensed and unregulated by the Commission. Yet, through this 1940 Amendment, Congress did expressly provide that, at least when the sales or arrangements for the casual or occasional interstate transportation were made by a licensed broker, then those sales and arrangements were to be considered "subject to" the

---

[20] Clause (9) of § 203 (b) was amended to read as follows, the new language being italicized:

"(9) the casual, occasional, or reciprocal transportation of passengers or property by motor vehicle in interstate or foreign commerce for compensation by any person not engaged in transportation by motor vehicle as a regular occupation or business, *unless, in the case of transportation of passengers, such transportation is sold or offered for sale, or provided or procured or furnished or arranged for, by a broker, or by any other person who sells or offers for sale transportation furnished by a person lawfully engaged in the transportation of passengers by motor vehicle under a certificate or permit issued under this part or under a pending application for such a certificate or permit.*" (Emphasis added.) 54 Stat. 921, 49 U. S. C. § 303 (b) (9).

Act. The effect of this was to prohibit brokers licensed under the Interstate Commerce Commission from also conducting an unlicensed travel bureau business. This was, therefore, an express congressional recognition of the policy announced by the Commission in the *Frank Broker Application, supra.*

In substance this amounted to a congressional assumption of jurisdiction, in 1940, in conflict with a part of the existing California policy which approved and attempted to regulate these transactions not only in intrastate but also in interstate transactions. This action of Congress, conforming to the Commission's declaration of policy in the *Broker Application* cases, substituted this federal prohibition in place of state regulation of these interstate activities. This attitude was strongly reenforced in 1942 and there has been no contrary federal action at any time. See also, *Copes Broker Application,* 27 M. C. C. 153, 155–156, 169–172, decided by the full Commission, December 20, 1940.

8. *April 28, 1941.—California* v. *Thompson,* 313 U. S. 109. This case overruled *Di Santo* v. *Pennsylvania,* 273 U. S. 34. It held that the 1933 California Act, at least prior to 1940, was valid, but the Court made it clear that it did so because *Congress had not then taken jurisdiction* over travel bureau or brokerage operations in selling or arranging for casual or occasional interstate motor carrier transportation of passengers. The opinion of the Court is full of reservations as to what might be the contrary effect of the taking of federal jurisdiction over these transactions. For example, the Court said:

"Congress has not undertaken to regulate the acts for which respondent was convicted or the interstate transportation to which they related. . . . Hence we are concerned here only with the constitutional authority of the state to regulate those who, within the state, aid or participate in a form of interstate

commerce over which Congress has not undertaken to exercise its regulatory power." *Id.* at p. 112, and see pp. 114 and 115.

9. *June 2, 1941.*—The 1933 California Act, which had been slightly revised in 1935, was substantially amended. The Amendment struck out the express application of the Act to interstate as well as intrastate transportation. While the Act evidently still applied, through its general language, to both types of transportation, the omission reflected the State's anticipation of the coming federal control over the interstate transactions. This anticipation was expressly stated in an amendment to § 2 limiting the State's regulation of these interstate transactions to a period in "the absence of action on the part of Congress or the Interstate Commerce Commission regulating or requiring licenses of motor carrier transportation agents acting as such for motor carriers carrying passengers in interstate commerce . . . ." [21] This demonstrated California's recognition of the lack of the necessity for, or even the lack of propriety in its attempting to exercise, state control in the face of federal control. This provision was later held by the Superior Court of

---

[21] "Sec. 2. Section 2 of the act cited in the title hereof is hereby amended to read as follows:

.      .      .      .      .

"In the absence of action on the part of Congress or the Interstate Commerce Commission regulating or requiring licenses of motor carrier transportation agents acting as such for motor carriers carrying passengers in interstate commerce (in this paragraph referred to as 'interstate motor carrier transportation agents') this act shall apply to and regulate such interstate motor carrier transportation agents to the same extent and in the same manner that it regulates or requires the licensing of motor carrier transportation agents acting as such for motor carriers carrying passengers in intrastate commerce (in this paragraph referred to as 'intrastate motor carrier transportation agents')." 1941 Cal. Stat., c. 539, pp. 1862, 1863, amending 1933 Cal. Stat., c. 390, which was the Act cited in the title of this 1941 Act.

California to cut off completely and voluntarily the state control after the anticipated federal action was taken in 1942. *People* v. *Van Horn*, 76 Cal. App. 2d 753, 174 P. 2d 12.

10. *March 21, 1942.*—This is the most significant date in these proceedings. It marked the issuance of the order of the Interstate Commerce Commission, effective May 15, 1942, in *Ex parte No. MC–35,* 33 M. C. C. 69, 49 C. F. R. Cum. Supp. § 210.1.[22] That order expressly removed the above-mentioned exemption which theretofore had excluded from regulation, under Part II of the Interstate Commerce Act, the casual, occasional and reciprocal transportation of passengers by motor vehicle in interstate commerce for compensation as provided in § 203 (b) (9). This order removed that exemption "to the extent necessary to make applicable all provisions of Part II of the act to such transportation when sold . . . or arranged for, by any person who sells, . . . or arranges for such transportation for compensation or as a regular occupation or business."[23] It thus expressly

---

[22] It was preceded, on February 3, 1942, by the report and order in *Ex parte No. MC–36,* 32 M. C. C. 267, effective April 1, 1942, 49 C. F. R. Cum. Supp. § 200.300. That order prescribed the kind of information that must be recorded, under federal control, by every passenger broker licensed under § 211 of Part II of the Interstate Commerce Act.

[23]                      "ORDER

"At a Session of the INTERSTATE COMMERCE COMMISSION, Division 5, held at its office in Washington, D. C., on the 21st day of March, A. D. 1942.

"EX PARTE NO. MC–35

"EXEMPTION OF CASUAL, OCCASIONAL, OR RECIPRO-CAL TRANSPORTATION OF PASSENGERS BY MOTOR VEHICLE

"*It appearing,* That by order of May 1, 1940, the Commission, division 5, entered into an investigation into practices with respect to the casual, occasional, or reciprocal transportation of passengers

brought under federal control the interstate passenger transportation arranged for through travel bureaus and it also brought those travel bureaus themselves under federal control. It required a license or permit to be secured for the trip and a broker's license to be secured by the bureau. §§ 203 (b) (9) and 211 (a), 49 Stat. 546,

in interstate or foreign commerce for compensation for the purpose of determining whether the exemption of such transportation as provided in section 203 (b) (9) of the act should be removed to the extent necessary to make applicable all provisions of the act to such transportation when it is sold, or offered for sale, or provided, or procured, or furnished, or arranged for by any person who holds himself or itself out as one who sells, or offers for sale transportation wholly or partially subject to the act, or who negotiates for, or holds himself out by solicitation, advertisement, or otherwise, as one who sells, provides, furnishes, contracts, or arranges for, such transportation;

"*And it further appearing,* That a full investigation of the matters and things involved has been made and that the division, on the date hereof, has made and filed a report containing its findings of fact and conclusions thereon, which report is hereby referred to and made a part hereof:

"*It is ordered,* That the Code of Federal Regulations be, and it is hereby, amended by adding the following:

"Title 49—Transportation and Railroads

"Chapter 1—Interstate Commerce Commission

"Subchapter B—Carriers by Motor Vehicle

"Part 210—Exemptions

"Sec. 210. 1 *Casual, occasional, or reciprocal transportation of passengers for compensation when such transportation is sold or arranged by anyone for compensation.* The partial exemption from regulation under the provisions of Part II of the Interstate Commerce Act of the casual, occasional, and reciprocal transportation of passengers by motor vehicle in interstate or foreign commerce for compensation as provided in section 203 (b) (9) of the act be, and it is hereby, removed to the extent necessary to make applicable all provisions of Part II of the act to such transportation when sold or offered for sale, or provided or procured or furnished or arranged for, by any person who sells, offers for sale, provides, furnishes, contracts, or arranges for such transportation for com-

554, 54 Stat. 921, 49 U. S. C. §§ 303 (b) (9) and 311 (a). The federal control was coextensive with the problem and carefully adjusted to it. There was no need, desire or willingness expressed to accept duplicate parallel state control of these interstate operations. On the other hand, it was expressly stated that it was the inability of the state and local officials properly to regulate such interstate operations that convinced the Commission of the necessity of federal control. *Ex parte No. MC-35, supra,* p. 76.

The intent of Congress and of its specially qualified Interstate Commerce Commission to take complete control of these interstate operations and to supersede the existing state regulation had been indicated in the amendment to § 203 (b) (9), made September 18, 1940. It was demonstrated beyond question in the Commission's report in *Ex parte No. MC-35, supra.* That report summarized two years of nationwide investigations. It dealt with the travel bureau problem especially upon an interstate basis. It made specific reference to interstate operations between California and Texas. Typical excerpts from the report have been quoted *supra,* pp. 765–767.

---

pensation or as a regular occupation or business. (Sec. 203 (b) (9), 49 Stat. 546, 54 Stat. 919, 921; 49 U. S. C. 303 (b) (9)).

"*It is further ordered,* That this order shall become effective May 15, 1942.

"*And it is further ordered,* That notice of this order be given to the general public affected thereby by publishing it in the Federal Register and by depositing copies thereof in the office of the Secretary of the Commission in Washington, D. C.

"By the Commission, division 5.

[Signed] "W. P. Bartel
"Secretary."

We are indebted to the Interstate Commerce Commission for the full text of the above order. The amendment to the Code of Federal Regulations made by this order appears in 49 C. F. R. Cum. Supp. § 210.1.

Bearing further upon the unsuitability of state and local control over the interstate features of this kind of transportation and upon the need for a more uniform and complete federal control, the report said:

"There can be little doubt that the removal of the exemption may in some instances work a hardship upon casual, occasional, or reciprocal transporters of passengers and upon persons traveling as passengers by that means of transportation, as well as upon travel bureaus. On the other hand, substantial benefits to the general public would result from the proper regulation of such transportation. If it were properly regulated, passengers using such transportation would not encounter many of the difficulties arising at present. In their testimony, briefs, and exceptions, several travel bureaus admit that reasonable rules and regulations governing the operations of travel bureaus in their appropriate and legitimate field are desirable and necessary. Casual, occasional, and reciprocal transportation of passengers cannot be regulated unless the exemption in section 203 (b) (9) is at least partially removed. The act does not give us power, without the removal of the exemption referred to, to prescribe reasonable rules and regulations governing, or to regulate in any other manner the operations of, travel bureaus. Proper regulation of travel bureaus engaged in legitimate operations can be accomplished only by amendment of the act." *Id.* at p. 80. See also, pp. 76–81.

The validity and binding effect of this order was upheld by the United States District Court for the Northern District of Illinois, November 18, 1942. See Findings of Fact and Conclusions of Law, in *Levin* v. *United States, sub nom., T. A. Drake et al.* v. *United States et al.,* 3 Fed. Car. Cas. (CCH) ¶ 80,100, judgment affirmed, *per curiam,* 319 U. S. 728.

11. *November 8, 1946.—People* v. *Van Horn,* 76 Cal. App. 2d 753, 174 P. 2d 12. There could be no doubt that the Federal Government had thus taken jurisdiction over the regulation of travel bureaus engaged in selling or arranging motor transportation in interstate commerce or that the federal statute prohibited such transportation without a federal license or permit. The effect of this action as relating to California was tested in 1945. The operator of a travel bureau arranging for casual interstate motor transportation between San Diego and points outside of California was charged with violation of the 1933 California Act, as amended by the Act of 1941. The Appellate Department of the Superior Court of that State, in *People* v. *Van Horn, supra,* thereupon held that the California statute no longer applied to such interstate commerce because, under its 1941 Amendment, that Act was made to apply only in "the absence of action on the part of Congress or the Interstate Commerce Commission regulating or requiring licenses of motor carrier transportation agents acting as such for motor carriers carrying passengers in interstate commerce . . . ." 1941 Cal. Stat., c. 539, § 2, p. 1863. The court recognized that, since 1942, that condition had been met. Accordingly, although California formerly had regulated these transactions, it was held that it had voluntarily abandoned such regulation in favor of the Federal Government.[24]

12. *July 8, 1947.*—The present California statute was approved. It repealed the Act of 1933, as amended in 1935 and 1941. While the application of the new Act to interstate transactions is not express, it was interpreted

---

[24] See also, *People* v. *Edmondson,* decided March 15, 1946, by the Appellate Department of the Superior Court, County of Los Angeles, California. The opinion of that court is not officially reported but appears in 1946 L. A. Crim. App. 2160. Cert. denied, October 14, 1946, 329 U. S. 716.

by the court below as being thus applicable.[25] It may indicate, therefore, a change in the legislative policy of California toward intrastate operations and an attempted change toward interstate operations but there is no evidence of a change in the policy of Congress.

Jurisdiction over these interstate transactions was assumed by Congress after thorough investigation of the need for such action. That legislation enacted was supreme and therefore exclusive. This does not mean that it might not have been shared with the states if Congress had so provided. We believe, however, that it does mean that, in order for the federal jurisdiction to have been so shared, there must have been some express or implied consent by Congress to do so. The position of Congress was perfectly clear in 1942. There has been no evidence of a change in it.

In Appendix C, *infra,* p. 784, there are placed in convenient juxtaposition the principal circumstances in this case which demonstrate conflicts between the California and federal legislation and policies, classified as follows:

(1) Conflicts inherent in the statutory texts.

(2) Emphasis expressly placed upon the mutual exclusiveness of the state and federal regulations.

(3) Conflicts between state and federal policies which led to the taking of federal jurisdiction over travel bureaus and share-the-expense motor transportation engaged in casual interstate operations.

In the absence of controverting evidence, the above list of circumstances presents a convincing argument against the conclusion that Congress, in this instance, either expressly or impliedly consented to share with California the regulation of casual, occasional or reciprocal transportation of passengers by motor vehicle in interstate commerce.

---

[25] See note 7, *supra,* p. 730.

While it may be uncertain where the line of exclusive federal jurisdiction impinges upon that of the states in the absence of the exercise of federal jurisdiction by Congress, there is no doubt that, when Congress has asserted its exclusive jurisdiction, it is for Congress to indicate the extent, if any, to which a state may then share it. To whatever extent that this is not so, federal law will have lost its constitutional supremacy over state law.

For these reasons we believe that the judgment should be affirmed.

### Appendix A.

### *The California Act of 1947.*

*"An act to repeal 'An act to define motor carrier transportation agent; to provide for the regulation, supervision and licensing thereof, and to provide for the enforcement of said act and penalties for the violation thereof; and repealing an act entitled "An act to define motor carrier transportation agent; to provide for the regulation, supervision and licensing thereof, and to provide for the enforcement of said act and penalties for the violation thereof," approved June 5, 1931, and all acts or parts of acts inconsistent with the provisions of this act,' approved May 15, 1933, and to add Sections 654.1, 654.2, and 654.3 to the Penal Code, relating to transportation of persons.*

"[Approved by Governor July 8, 1947. Filed with Secretary of State July 8, 1947.]

*"The people of the State of California do enact as follows:*

"Section 1. The act cited in the title hereof is repealed.

"Sec. 2. Section 654.1 is added to the Penal Code, to read:

"654.1. It shall be unlawful for any person, acting individually or as an officer or employee of a corporation, or as a member of a copartnership or as a commis-

sion agent or employee of another person, firm or corporation, to sell or offer for sale or, to negotiate, provide or arrange for, or to advertise or hold himself out as one who sells or offers for sale or negotiates, provides or arranges for transportation of a person or persons on an individual fare basis over the public highways of the State of California unless such transportation is to be furnished or provided solely by, and such sale is authorized by, a carrier having a valid and existing certificate of convenience and necessity, or other valid and existing permit from the Public Utilities Commission of the State of California, or from the Interstate Commerce Commission of the United States, authorizing the holder of such certificate or permit to provide such transportation.

"Sec. 3. Section 654.2 is added to the Penal Code, to read:

"654.2. The provisions of Section 654.1 of the Penal Code shall not apply to the selling, furnishing or providing of transportation of any person or persons

"(1) When no compensation is paid or to be paid, either directly or indirectly, for such transportation;

"(2) To the furnishing or providing of transportation to or from work, of employees engaged in farm work on any farm of the State of California;

"(3) To the furnishing or providing of transportation to and from work of employees of any nonprofit cooperative association, organized pursuant to any law of the State of California;

"(4) To the transportation of persons wholly or substantially within the limits of a single municipality or of contiguous municipalities;

"(5) To transportation of persons over a route wholly or partly within a national park or state park where such transportation is sold in conjunction with or as part of a rail trip or trip over a regularly operated motor bus transportation system or line;

"(6) To the transportation of passengers by a person who is driving his own vehicle and the transportation of persons other than himself and members of his family when transporting such persons to or from their place of employment and when the owner of such vehicle is driving to or from his place of employment; provided that arrangements for any such transportation provided under the provisions of this subsection shall be made directly between the owner of such vehicle and the person who uses or intends to use such transportation.

"SEC. 4. Section 654.3 is added to the Penal Code, to read:

"654.3. Violation of Section 654.1 shall be a misdemeanor, and upon first conviction the punishment shall be a fine of not over two hundred fifty dollars ($250), or imprisonment in jail for not over 90 days, or both such fine and imprisonment. Upon second conviction the punishment shall be imprisonment in jail for not less than 30 days and not more than 180 days. Upon a third or subsequent conviction the punishment shall be confinement in jail for not less than 90 days and not more than one year, and a person suffering three or more convictions shall not be eligible to probation, the provisions of any law to the contrary notwithstanding." 1947 Cal. Stat., c. 1215, pp. 2723–2725.

APPENDIX B.

(1) *National Transportation Policy.*

"It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster

sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions;—all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy." Inserted before Part I of the Interstate Commerce Act, 54 Stat. 899, 49 U. S. C., note preceding § 1.

The foregoing "National Transportation Policy" has, for many purposes, superseded the declaration of the policy of Congress enunciated in the original § 202 of the Motor Carrier Act, 1935, to which a cross reference was made expressly in § 203 (b), 49 Stat. 545. This cross reference prescribed that, in order to make Part II of the Interstate Commerce Act applicable to the kind of interstate transportation described in § 203 (b) (9), the Commission must "find that such application is necessary to carry out the policy of Congress enunciated in section 202, . . . ." The policy of Congress thus referred to as being enunciated in § 202 was contained in the original form of § 202 (a), 49 Stat. 543. It read as follows:

"Sec. 202. (a) It is hereby declared to be the policy of Congress to regulate transportation by motor carriers in such manner as to recognize and preserve the inherent advantages of, and foster sound economic conditions in, such transportation and among such carriers in the pub-

lic interest; promote adequate, economical, and efficient service by motor carriers, and reasonable charges therefor, without unjust discriminations, undue preferences or advantages, and unfair or destructive competitive practices; improve the relations between, and coordinate transportation by and regulation of, motor carriers and other carriers; develop and preserve a highway transportation system properly adapted to the needs of the commerce of the United States and of the national defense; and cooperate with the several States and the duly authorized officials thereof and with any organization of motor carriers in the administration and enforcement of this part."

The foregoing original § 202 (a) was repealed, September 18, 1940, 54 Stat. 920. At the same time the designation of the original § 202 (b) and (c) were changed respectively to § 202 (a) and (b). (Both of these subsections are material and they are printed in Appendix B (2), *infra.*)

Accordingly, § 202 of Part II of the Interstate Commerce Act ceased to contain any statement of the general "policy of Congress" corresponding to that contained in the original form of § 202 (a). On the other hand, the very same Act which thus removed this declaration of policy from Part II of the Interstate Commerce Act inserted "before Part I" of that Act a new paragraph entitled "National Transportation Policy." This is the paragraph quoted above from 54 Stat. 899. In the codification of Title 49, a reference to this new paragraph was substituted for the original reference to § 202. The codified clause thus required the Commission to "find that such application is necessary to carry out the national transportation policy declared in the Interstate Commerce Act, . . ." 49 U. S. C. § 303 (b), instead of "the policy of Congress enunciated in section 202, . . . ." We have adopted that interpretation in this opinion.

(2) *Material Provisions of Part II of the Interstate Commerce Act.*

"SEC. 202. (a) The provisions of this part apply to the transportation of passengers or property by motor carriers engaged in interstate or foreign commerce and to the procurement of and the provision of facilities for such transportation, and the regulation of such transportation, and of the procurement thereof, and the provision of facilities therefor, is hereby vested in the Interstate Commerce Commission.

"(b) Nothing in this part shall be construed to affect the powers of taxation of the several States or to authorize a motor carrier to do an intrastate business on the highways of any State, or to interfere with the exclusive exercise by each State of the power of regulation of intrastate commerce by motor carriers on the highways thereof." 49 Stat. 543, as amended, 54 Stat. 920, 49 U. S. C. § 302 (a) and (b).

"SEC. 203. . . .

"(b) Nothing in this part, except the provisions of section 204 relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment shall be construed to include (1) motor vehicles employed solely in transporting school children and teachers to or from school; or (2) taxicabs, or other motor vehicles performing a bona fide taxicab service, having a capacity of not more than six passengers and not operated on a regular route or between fixed termini; or (3) motor vehicles owned or operated by or on behalf of hotels and used exclusively for the transportation of hotel patrons between hotels and local railroad or other common carrier stations; or (4) motor vehicles operated, under authorization, regulation, and control of the Secretary of the Interior, principally for the purpose of transporting persons in and about the national parks and

national monuments; or (4a) motor vehicles controlled and operated by any farmer when used in the transportation of his agricultural commodities and products thereof, or in the transportation of supplies to his farm; or (5) motor vehicles controlled and operated by a cooperative association as defined in the Agricultural Marketing Act, approved June 15, 1929, as amended, or by a federation of such cooperative associations, if such federation possesses no greater powers or purposes than cooperative associations so defined; or (6) motor vehicles used in carrying property consisting of ordinary livestock, fish (including shell fish), or agricultural commodities (not including manufactured products thereof), if such motor vehicles are not used in carrying any other property, or passengers, for compensation; or (7) motor vehicles used exclusively in the distribution of newspapers; or (7a) the transportation of persons or property by motor vehicle when incidental to transportation by aircraft; nor, unless and to the extent that the Commission shall from time to time find that such application is necessary to carry out the policy of Congress enunciated in section 202,[26] shall the provisions of this part, except the provisions of section 204 relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment apply to: (8) The transportation of passengers or property in interstate or foreign commerce wholly within a municipality or between contiguous municipalities or within a zone adjacent to and commercially a part of any such municipality or municipalities, except when such transportation is under a common control, management, or arrangement for a continuous carriage or shipment to or from a point without such municipality, municipalities, or zone, and provided that the motor carrier engaged in such transportation of passengers over regular or irregular route

---

[26] See Appendix B (1), *supra*.

or routes in interstate commerce is also lawfully engaged in the intrastate transportation of passengers over the entire length of such interstate route or routes in accordance with the laws of each State having jurisdiction; or (9) the casual, occasional, or reciprocal transportation of passengers or property by motor vehicle in interstate or foreign commerce for compensation by any person not engaged in transportation by motor vehicle as a regular occupation or business, unless, in the case of transportation of passengers, such transportation is sold or offered for sale, or provided or procured or furnished or arranged for, by a broker, or by any other person who sells or offers for sale transportation furnished by a person lawfully engaged in the transportation of passengers by motor vehicle under a certificate or permit issued under this part or under a pending application for such a certificate or permit." 49 Stat. 545–546, as amended by 52 Stat. 1029, 1237, 54 Stat. 921, 49 U. S. C. § 303 (b).

"SEC. 211. (a) No person shall for compensation sell or offer for sale transportation subject to this part or shall make any contract, agreement, or arrangement to provide, procure, furnish, or arrange for such transportation or shall hold himself or itself out by advertisement, solicitation, or otherwise as one who sells, provides, procures, contracts, or arranges for such transportation, unless such person holds a broker's license issued by the Commission to engage in such transactions: *Provided, however,* That no such person shall engage in transportation subject to this part unless he holds a certificate or permit as provided in this part. In the execution of any contract, agreement, or arrangement to sell, provide, procure, furnish, or arrange for such transportation, it shall be unlawful for such person to employ any carrier by motor vehicle who or which is not the lawful holder of an effective certificate or permit issued as provided in this part: *And provided further,* That the provisions of this paragraph shall not apply to any carrier holding a certificate

or a permit under the provisions of this part or to any bona fide employee or agent of such motor carrier, so far as concerns transportation to be furnished wholly by such carrier or jointly with other motor carriers holding like certificates or permits, or with a common carrier by railroad, express, or water." 49 Stat. 554, 49 U. S. C. § 311 (a).

"SEC. 222. (a) Any person knowingly and willfully violating any provision of this part, or any rule, regulation, requirement, or order thereunder, or any term or condition of any certificate, permit, or license, for which a penalty is not otherwise herein provided, shall, upon conviction thereof, be fined not more than $100 for the first offense and not more than $500 for any subsequent offense. Each day of such violation shall constitute a separate offense." 49 Stat. 564, 49 U. S. C. § 322 (a).

## APPENDIX C.

*Summary of conflicts between California and federal legislation and policies.*

### (1) *Conflicts inherent in the statutory texts.*

| CALIFORNIA STATUTE. | FEDERAL STATUTE. |
|---|---|
| (See Appendix A, *supra*.) | (See Appendix B (2), *supra*.) |

*(a) Persons Affected and Activities Prohibited.*

SEC. 203. (a) As used in this part—

654.1. It shall be unlawful for any *person, acting individually or as an officer or employee* of a corporation, or as a member of a copartnership or as a commission agent or employee of another person, firm or corporation, to sell or offer for sale or, to negotiate, provide or arrange for, or to advertise or hold himself out

(1) The term *"person"* means any *individual, firm, copartnership, corporation, company,* association, or joint-stock association; and includes any trustee, receiver, assignee, or personal representative thereof. 49 Stat. 544, 49 U. S. C. § 303 (a) (1).

SEC. 211. (a) *No person shall for compensation sell* or offer for

as one who sells or offers for sale or negotiates, provides or arranges for transportation of a person or persons *on an individual fare basis* over the public highways of the State of California *unless* such transportation is to be furnished or provided solely by, and such sale is authorized by, a carrier having a valid and existing certificate of convenience and necessity, or other valid and existing *permit from the Public Utilities Commission of the State of California, or from the Interstate Commerce Commission* of the United States, authorizing the holder of such certificate or permit to provide such transportation.

(In addition to the textual variations between the state and federal prohibitions, this measure differs from the federal measure because this merely prohibits *travel bureau operations as such* unless the carrier has a state or federal license or permit *and it does not require that the broker selling or arranging for the transportation must be a licensed broker.*)

sale transportation subject to this part or shall make any contract, agreement, or arrangement to provide, procure, furnish, or arrange for such transportation or shall hold himself or itself out by advertisement, solicitation, or otherwise as one who sells, provides, procures, contracts, or arranges for such transportation, *unless such person holds a broker's license issued by the Commission* to engage in such transactions: *Provided however,* That *no such person shall engage in transportation subject to this part unless he holds a certificate or permit as provided in this part.* In the execution of any contract, agreement, or arrangement to sell, provide, procure, furnish, or arrange for such transportation, it shall be unlawful for such person to employ any carrier by motor vehicle who or which is not the lawful holder of an effective certificate or permit issued as provided in this part: . . . .

(In addition to the textual variations between the state and federal prohibitions, this differs from the state measure because this measure not only prohibits *interstate travel bureau operations as such* unless the carrier holds a federal license or permit, *but it also requires that the broker selling or arranging for the transportation must hold a federal broker's license.*)

(b) *Exemptions.*

654.2. The provisions of Section 654.1 of the Penal Code *shall not apply* to the selling, furnishing or providing of transportation of any person or persons

(1) *When no compensation is paid* or to be paid, either directly or indirectly, for such transportation;

(2) To the furnishing or providing of transportation to or from work, of *employees engaged in farm work on any farm of the State of California;*

(3) To the furnishing or providing of transportation to and from work of *employees of any nonprofit cooperative association, organized pursuant to any law of the State of California;*

(4) To the transportation of persons wholly or substantially *within the limits of a single municipality or of contiguous municipalities;*

(5) To transportation of persons over a route *wholly or partly within a national park or state park where such transportation is sold in conjunction with or as part of a rail trip or trip over a regularly operated motor bus transportation system or line;*

(6) To the transportation of passengers by a person who is driving his own vehicle and the transportation of persons other than himself and members of his family when transporting such persons to or from their place

Sec. 211. (a) . . . *And provided further,* That the provisions of this paragraph *shall not apply to any carrier holding a certificate or a permit under the provisions of this part* or to any bona fide employee or agent of such motor carrier, so far as concerns transportation to be furnished wholly by such carrier or jointly with other motor carriers holding like certificates or permits, or with a common carrier by railroad, express, or water.

Sec. 203. . . .

(b) *Nothing in this part, except the provisions of section 204 relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment shall be construed to include* (1) motor vehicles employed solely in transporting *school children and teachers* to or from school; or (2) *taxicabs,* or other motor vehicles performing a bona fide taxicab service, having a capacity of not more than six passengers and not operated on a regular route or between fixed termini; or (3) motor vehicles owned or operated *by or on behalf of hotels* and used exclusively for the transportation of hotel patrons between hotels and local railroad or other common carrier stations; or (4) *motor vehicles operated, under authorization, regulation, and control of the Secretary of the Interior, principally for the purpose of transporting persons*

of employment and when the owner of such vehicle is driving to or from his place of employment; provided that arrangements for any such transportation provided under the provisions of this subsection shall be made directly between the owner of such vehicle and the person who uses or intends to use such transportation.

in and about the national parks and national monuments; or (4a) motor vehicles controlled and operated by any farmer when used in the transportation of his agricultural commodities and products thereof, or in the transportation of supplies to his farm; or (5) motor vehicles controlled and operated by a cooperative association as defined in the Agricultural Marketing Act, approved June 15, 1929, as amended, or by a federation of such cooperative associations, if such federation possesses no greater powers or purposes than cooperative associations so defined; or (6) motor vehicles used in carrying property consisting of ordinary livestock, fish (including shell fish), or agricultural commodities (not including manufactured products thereof), if such motor vehicles are not used in carrying any other property, or passengers, for compensation; or (7) motor vehicles used exclusively in the distribution of newspapers; or (7a) the transportation of persons or property by motor vehicle when incidental to transportation by aircraft; nor, unless and to the extent that the Commission shall from time to time find that such application is necessary to carry out the policy of Congress enunciated in section 202, shall the provisions of this part, except the provisions of section 204 relative to qualifications and maximum hours of service of employ-

788

ees and safety of operation or standards of equipment apply to: (8) The transportation of passengers or property in interstate or foreign commerce *wholly within a municipality or between contiguous municipalities or within a zone adjacent to and commercially a part of any such municipality or municipalities, except* when such transportation is under a common control, management, or arrangement for a continuous carriage or shipment to or from a point without such municipality, municipalities, or zone, and provided that the motor carrier engaged in such transportation of passengers over regular or irregular route or routes in interstate commerce is also lawfully engaged in the intrastate transportation of passengers over the entire length of such interstate route or routes in accordance with the laws of each State having jurisdiction; or (9) *the casual, occasional, or reciprocal transportation of passengers or property by motor vehicle in interstate or foreign commerce for compensation by any person not engaged in transportation by motor vehicle as a regular occupation or business, unless,* in the case of transportation of passengers, such transportation is sold or offered for sale, or provided or procured or furnished or arranged for, *by a broker,* or by any other person who sells or offers for sale transportation furnished by a person

lawfully engaged in the transportation of passengers by motor vehicle under a certificate or permit issued under this part or under a pending application for such a certificate or permit.

*(c) Penalties.*

654.3. Violation of Section 654.1 shall be a misdemeanor, and upon *first conviction* the punishment shall be a fine of not over two hundred fifty dollars ($250), or imprisonment in jail for not over 90 days, or both such fine and imprisonment. Upon *second conviction* the punishment shall be imprisonment in jail for not less than 30 days and not more than 180 days. Upon a *third or subsequent conviction* the punishment shall be confinement in jail for not less than 90 days and not more than one year, and a person suffering three or more convictions shall not be eligible to probation, the provisions of any law to the contrary notwithstanding.

Sec. 222. (a) Any person knowingly and willfully violating any provision of this part, or any rule, regulation, requirement, or order thereunder, or any term or condition of any certificate, permit, or license, for which a penalty is not otherwise herein provided, shall, upon conviction thereof, be fined not more than $100 for the *first offense* and not more than $500 for *any subsequent offense.* Each day of such violation shall constitute a separate offense.

(2) *Emphasis expressly placed upon the mutual exclusiveness of the state and federal regulations assigning intrastate regulation to the states, and interstate regulation to the Interstate Commerce Commission upon its finding it necessary.*

1933 California Act.

Federal Act—Motor Carrier Act, 1935, Part II, Interstate Commerce Act.

The state policy of regulation of motor carrier transportation

"The provisions of this part apply to the transportation of

agents and unlicensed share-the-expense motor carriers was to apply to *interstate, as well as intrastate, transportation "until such time as Congress of the United States shall act, . . . ."* P. 760, *supra.*

passengers or property by motor carriers engaged in *interstate* or foreign commerce . . . *and the regulation of such transportation, . . . is hereby vested in the Interstate Commerce Commission."* § 202 (a), Appendix B (2), *supra.*

*"Nothing in this part shall be construed . . . to interfere with the exclusive exercise by each ·State of the power of regulation of intrastate commerce* by motor carriers on the highways thereof." § 202 (b), Appendix B (2), *supra.*

*Nothing in this part was to include the casual, occasional,* or reciprocal transportation of passengers by motor vehicle in *interstate commerce* for compensation by any person not engaged in such transportation as a regular occupation or business *"unless and to the extent that the Commission shall from time to time find that such application is necessary to carry out the policy of Congress enunciated in section 202, . . . ."* § 203 (b), Appendix B (2), *supra.*

Federal Act—1940 Amendment to Part II of the Interstate Commerce Act.

This *partly removed the exemption of the Federal Act from the casual, occasional,* or reciprocal transporters of persons or property in *interstate commerce.* The removal applied to cases, for example, where the transporta-

1941 California Amendments.

The state regulation of the *interstate transportation was limited to a period in "the absence of action on the part of Congress or the Interstate Commerce Commission* regulating or requiring licenses of motor carrier

transportation agents acting as such for motor carriers carrying passengers in interstate commerce . . . ." P. 769, *supra*.

1947 California Act.

This repealed the 1933 Act, as amended in 1941, and mentioned only "transportation . . . over the public highways of the State of California . . . ." Appendix A, *supra*. This could be interpreted as limited to intrastate transportation but *it was interpreted, by the court below, as an invalid attempt to invade the federal jurisdiction over interstate commerce*. Note 7, *supra*.

tion was sold or arranged for by a broker. Note 20, *supra*.

Federal Order—1942 Order of the Interstate Commerce Commission.

This *further removed the exemption from the casual, occasional*, or reciprocal transporters of persons or property in *interstate commerce*. This federal order brought these interstate operations under the Federal Act and under the regulations of the Commission. By virtue of the self-terminating provisions of the California Act, *this order cut off the state regulation of these interstate operations*. Note 23, *supra*.

(3) *Conflicts between state and federal policies which led to the taking of federal jurisdiction over travel bureaus and share-the-expense motor transportation engaged in casual interstate operations.*

The 1931 California Act recognized and *licensed travel bureaus arranging share-the-expense interstate*, as well as intrastate, *motor trips by unlicensed carriers*. Pp. 759–760, *supra*.

The 1933 California Act continued this policy as to interstate as well as intrastate transportation. It stated, however, that such application to *interstate transportation would continue only until such time as the Congress of the United States took action*. Pp. 760–761, *supra*.

In 1935 and 1940, Part II of the Interstate Commerce Act *gave warning that federal control would be taken when the Interstate Commerce Commission found it necessary in order to carry out the policy of Congress*. Pp. 761–762, 767–768, *supra*.

The 1941 California Amendments *emphasized the limitation upon state regulation of interstate transportation.* Pp. 769–770, *supra.*

In 1940, the Interstate Commerce Commission began its expressly authorized *investigations* into the operations of travel bureaus and share-the-expense interstate motor transportation. Pp. 765–767, *supra.* In 1942, these resulted in the *Commission's conclusion that such operations, as applied to interstate commerce, were contrary to public policy.* It declined to issue a license even to a regular transportation broker unless he agreed to refrain from such operations. It expressly found that state and local officials were unable to regulate such operations because a large proportion of the transportation was interstate.

In 1942, *the anticipated federal action automatically cut off the California regulation of these interstate operations.* Pp. 770–774, *supra.*

In 1942, the Interstate Commerce Commission order *largely removed the statutory exemption of these travel bureaus and operations from the Interstate Commerce Act and federal control has been continuously exercised over them since that date.* Pp. 770–773, *supra.*