**SUBURBAN TRAILS, INC. and Suburban Transit Corp., Plaintiffs,**

v.

**NEW JERSEY TRANSIT CORPORATION, New Jersey Transit Bus Operations, Inc., John P. Sheridan, Jr., Jerome C. Premo, Albert R. Hasbrouck, III, George W. Heinle, Martin Brody, Edward Borrone, David Lehmkuhl, Prentis C. Nolan, III, John L. McGoldrick, Bogle, Richard B. Standiford, and Roger A. Bodman, Defendants.**

Civ. A. No. 85–1398.

United States District Court, D. New Jersey.

Oct. 31, 1985.

Wilentz, Goldman & Spitzer, Wood-bridge, N.J., for plaintiffs.

Robert H. Stoloff, Deputy Atty. Gen., Trenton, N.J., for defendants.

## OPINION

SAROKIN, District Judge.

Over the past thirty years, this nation's use of its mass transportation systems has undergone a steady decline as Americans have turned from public transportation to private automobiles.[1] The result has been a steady deterioration in mass transit systems, leading in some areas to the abandonment of individual lines or entire systems.[2] Since 1964, Congress has attempted to counteract this trend by means of the Urban Mass Transit Act (UMTA), 49 U.S.C. § 1601 et seq., which provides for the appropriation of funds in order to aid the states in the maintenance and improvement of their transit systems. More recently, Congress has addressed the problem in another way, by encouraging deregulation of private interstate carriers in the Bus Regulatory Reform Act of 1982, 49 U.S.C. § 10101 et seq.

In this case, which involves a suit by a private carrier against the New Jersey Transit Corporation for withholding UMTA funds from that company because of its decision to commence operating a public transit route along a highway already serviced by New Jersey Transit's subsidiary bus company, the court is faced with motions to dismiss and for summary judgment which require it to determine whether the state agency's decision to place such a restriction on the allocation of UMTA funds conflicts with the goals of the Bus Regulatory Reform Act and thereby violates the supremacy clause, or whether such action violates the antitrust principles of the Sherman Act.

## BACKGROUND

### 1. The federal regulatory scheme

When Congress passed the Urban Mass Transit Act of 1963, it declared:

... that the welfare and vitality of urban areas, the satisfactory movement of people and goods within such areas, and the effectiveness of housing, urban renewal, highway and other federally aided programs are being jeopardized by the deterioration or inadequate provision of urban transportation facilities, the intensifi-

---

1. See H.Rep. No. 204, 88th Cong. 2d Sess., reprinted in 1964 U.S.Code Cong. & Ad.News 2569, 2571.

2. See id., reprinted in 1964 U.S.Code Cong. & Ad.News at 2572.

cation of traffic congestion, and the lack of coordinated transportation and other development planning on a comprehensive and continuing basis; and

... that Federal financial assistance for the development of efficient and coordinated mass transportation systems is essential to the solution of these urban problems.

Pub.L. 88–365 § 2, 78 Stat. 302, codified at 49 U.S.C. § 1601(a)(2)–(3). As Congress further explained with amending language in 1970, it envisioned the Act "to create a partnership which permits the local community, through Federal financial assistance, to exercise the initiative necessary to satisfy its urban mass transportation requirements." Pub.L. 91–453 § 1, 84 Stat. 962, codified at 49 U.S.C. § 1601a. The remaining provisions of the Act set out the guidelines of the regulatory scheme to be used to implement these goals. Thus, 49 U.S.C. § 1602 authorizes the Secretary of Transportation "in accordance with the provisions of this chapter and on such terms and conditions as the Secretary may prescribe,"[3] to make loans and grants to states and local public bodies for the acquisition, construction, and improvement of facilities and equipment for mass transportation services, "and the coordination of such service with highway and other transportation". With regard to dispersal of the funds at the local level, 49 U.S.C. § 1604(b) invokes

state and local participation by establishing that the funds are to be received and dispensed by a "designated recipient" selected by state and local officials and approved by the Secretary. Local participation is further encouraged by 49 U.S.C. § 1604(g), which requires that the funding is to be made available only after the state or local community has established that it is to be used in the context of a locally developed long-range transportation plan or program, as defined in 49 U.S.C. § 1607. Finally, 49 U.S.C. § 1608 authorizes the Secretary of Transportation to prescribe further necessary rules to carry out the provisions of the Act, to sue and be sued, and to take "such actions as may be necessary" to require state and local agencies to comply with the terms of their grant applications. In sum, the thrust of UMTA is twofold; not only to make federal funds available to finance current revitalization, but also to use those funds as an incentive to encourage state and local bodies to exercise their "partnership" duties responsibly by implementing long-range mass transit planning and coordination.

The philosophy behind the Bus Regulatory Reform Act of 1982 is quite different. As noted in Senate Report No. 97–411, 1982 U.S.Code Cong. & Ad.News 2308, that legislation was intended to "eliminate outdated and cumbersome regulation, thereby al-

---

**3.** Pursuant to this power, the Urban Mass Transit Administration (UMTA) requires that its funds be dispersed in accordance with its regulations, the state recipient's application, plan and program, and the Funding Agreement entered into between UMTA and the state recipient. Among the provisions of the application submitted by New Jersey Transit are a dispensing formula under which capital equipment purchased with UMTA grants is to be distributed to private bus companies as follows: (1) buses purchased with UMTA funds are to be allocated based on the age of, and to replace, buses 12 years of age or older which are used by a private carrier to meet its peak period requirements on its regular route services, N.J.A.C. § 16:75–2.1, and (2) the allocation and apportionment of capital equipment other than buses is to be made based on the regular route revenue bus mileage of the private carrier during designated calendar years, N.J.A.C. § 16:76–2.1. Suburban Trails makes various allegations in its

affidavits that New Jersey Transit's decision to deny it funding contravened these guidelines, and thereby implies that New Jersey Transit has also violated the terms of the agreement entered into between it and UMTA. Noticeably absent from its complaint or briefs, however, is any explicit argument that New Jersey Transit has violated the provisions of UMTA. The court therefore finds it unnecessary to determine whether Suburban Trails has an implied cause of action to challenge a state or local body for failure to abide by the terms of its agreement with UMTA, *see Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 13, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981); *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 15, 101 S.Ct. 1531, 1538, 67 L.Ed.2d 694 (1981); *Angelastro v. Prudential-Bache Securities, Inc.*, 764 F.2d 939 (3d Cir. 1985), or whether such a claim would succeed on the merits.

lowing greater flexibility of service and increased competition." *Id.* The Act, which is administered by the Interstate Commerce Commission (ICC), seeks to achieve this goal by liberalizing the standards under which the ICC may authorize entry into, 49 U.S.C. § 10922, and exit from, 49 U.S.C. § 10935, the interstate carrier industry, and by removing state regulatory restrictions on intercity bus operations, 49 U.S.C. § 11501(e).[4]

### 2. *The facts of this case*

U.S. Route 9 is a major corridor used by highway traffic travelling from New Jersey to New York City. Plaintiff Suburban Trails is a private bus company which holds the right to transport passengers along that corridor under a certificate of public convenience and necessity issued by the ICC pursuant to the liberalized standards of the Bus Regulatory Reform Act. As a private company providing mass transit services, it is also within the class of entities potentially eligible for UMTA funding. 49 U.S.C. § 1609(e). Defendant New Jersey Transit is an agency established by the state of New Jersey to coordinate the state's transit services. To this end, it has been designated the state's "recipient" of UMTA funds under 49 U.S.C. § 1604. In addition, New Jersey Transit has two wholly-owned subsidiary corporations, New Jersey Transit Bus Operations, Inc., and New Jersey Transit Rail, Inc., which operate regular common carrier bus and rail passenger services.

For a number of years prior to 1980, two private bus companies, Lincoln Transit Company and Transport of New Jersey, operated a coordinated commuter bus schedule along Route 9. In 1980, Transport of New Jersey was purchased by New Jersey Transit, and in 1983 Lincoln Transit declared bankruptcy, whereupon New Jer-

sey Transit assumed responsibility for the entire service along the Route 9 corridor. Meanwhile, however, Suburban Trails had purchased Lincoln Transit's outstanding certificate of public convenience and necessity for operations along Route 9, and had thereafter received a renewal of the certificate from the ICC. By mid-1984 it had commenced plans to operate a Route 9 commuter bus service, and it actually instituted such service in December of 1984.

According to plaintiffs, New Jersey Transit began to express strong opposition to their decision to commence Route 9 service almost immediately upon learning of the plan. New Jersey Transit's dissatisfaction was made most apparent when it informed Suburban Trails that the portion of the 1983 UMTA capital equipment grant that it had requested in order to fund the purchase of twenty-five new Suburban Trails buses would be withheld until Suburban Trails agreed in writing not to operate on Route 9 in competition with New Jersey Transit Bus. Plaintiffs then filed suit, claiming that in so penalizing Suburban Trails' exercise of its right to use its certificate of public convenience along Route 9, New Jersey Transit has violated the Interstate Commerce Act as amended by the Bus Regulatory Reform Act of 1982, 49 U.S.C. § 10101, the supremacy clause, U.S. Const. Art. III, the Sherman Antitrust Act, 15 U.S.C. § 1, and the due process clause of the fourteenth amendment. Plaintiffs' complaint further alleges that to the extent that defendants' actions were authorized by Title 16, Subtitle L of the New Jersey Administrative Code, such provisions are in violation of the same constitutional and federal statutory provisions. Defendants now move to dismiss the complaint, and plaintiffs cross-move for a preliminary injunction, summary judgment and a perma-

---

**4.** Thus 49 U.S.C. § 10101, which sets out the national transportation policy, was amended by the Bus Regulatory Reform Act to state that:

> it is the policy of the United States ... (3) in regulating transportation by motor carriers of passengers (A) to cooperate with the States on transportation matters for the purpose of encouraging the States to exercise intrastate reg-

> ulatory jurisdiction in accordance with the objections [sic] of this subtitle; (B) to provide Federal procedures which ensure that intrastate regulation is exercised in accordance with this subtitle; and (C) to ensure that Federal reform initiatives enacted by the Bus Regulatory Reform Act of 1982 are not nullified by State regulatory actions.

## 1388

nent injunction. Because the court relies on parts of the record which are outside the scope of the complaint, it treats both parties' motions as motions for summary judgment.

### DISCUSSION

#### 1. *Ripeness*

 Before proceeding to the merits, the court addresses the defendants' claim that the court should refrain from deciding this dispute because the issues are not ripe. According to the defendants, the court's disposition of the dispute at this time is premature because defendants have not as yet received the UMTA funds, and have not yet made any final decision about how those funds will be allocated. Plaintiffs hotly contest the facts submitted in defendants' affidavits regarding the status of the UMTA grant, as well as the finality of defendants' plans to deny plaintiffs access to any part of that grant. The court finds it unnecessary to resolve these factual disputes, however, because it concludes that even under the facts undisputed by defendants the case is ripe for review.

The ripeness doctrine as developed by the Supreme Court contains two elements, the first of which is jurisdictional in the sense that it is an essential precondition to a federal court's exercise of its authority, *see Regional Rail Reorganization Act Cases*, 419 U.S. 102, 138, 95 S.Ct. 335, 355, 42 L.Ed.2d 320 (1974), and the other of which is a matter of discretion, permitting the court to "exercise judicial restraint from decisions of unnecessary ... issues", *id.* The first element arises from the requirement of Article III that there be a live "case or controversy," and ensures that the parties will have a "sufficient 'personal stake'" in the matter to present "a real and substantial controversy admitting of specific relief through a decree of conclusive character, as distinguished from an opinion advising what the law would be on a hypothetical set of facts." *Buckley v.*

*Valeo*, 424 U.S. 1, 12, 96 S.Ct. 612, 631, 46 L.Ed.2d 659 (1976) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937)). That requirement has clearly been met in this case. Given the substance of letters and memoranda which have been made part of the record, defendants cannot dispute that they have at least threatened sanctions against plaintiffs for engaging in the Route 9 service, and plaintiffs' affidavits further establish that defendants have taken substantial steps in carrying out those threats.[5] In this factual context, the court's evaluation of plaintiffs' claims that defendants have no right to deny them UMTA funding for the reasons articulated would hardly constitute adjudication of the "hypothetical" kind of controversy that Article III places beyond this court's jurisdiction.

 Nor does the court consider it appropriate to invoke the prudential element of the ripeness doctrine in this case. Defendants' argument in support of such a conclusion appears to be that the court should decline to decide the merits of the case until their denial of the funds to Suburban Trails has been finalized, since they may moot the issue by changing their minds in the meantime. The court concludes, however, that it would be inappropriate to postpone adjudication of this action based on defendants' mere suggestion that they may decide to depart from a course of action that they have already clearly set. As indicated by the Supreme Court, an agency's final enforcement of its articulated policies should not be viewed as a necessary prerequisite to adjudication if those policies require plaintiffs to adjust their conduct "with serious penalties attached to noncompliance." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 153, 87 S.Ct. 1507, 1517, 18 L.Ed.2d 681 (1967); *see also Pacific Gas & Electric Co. v. State Energy Resources Conservation & Devel-*

---

5. Plaintiffs' affidavits indicate, for example, that immediately after Suburban Trails began its Route 9 service, defendants removed the program disks from electronic ticket machines which had been purchased for Suburban Transit with UMTA funds, rendering them completely inoperable.

*opment Comm'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983).[6] The court believes that defendant's threats are sufficiently sincere, and the threatened harm is sufficiently serious, to warrant adjudication at this time.[7]

### 2. *Supremacy Clause*

 Proceeding to the merits, the court first addresses plaintiffs' claim that defendants' actions violate the supremacy clause because they conflict with the Interstate Commerce Act as amended by the Bus Regulatory Reform Act.[8] It is a fundamental tenet of this nation's political system that where state regulatory actions conflict with federal law, the former are preempted by the latter. Application of this precept can, however, take a number

of different forms, depending on the seriousness of the federal interests involved and the directness of the conflict. The Supreme Court has articulated three general inquiries to guide the courts in their evaluation of preemption claims. According to the Court's precedent, the most likely candidate for a finding of preemption is a situation where an "act of Congress fairly interpreted is in actual conflict with the law of the state," *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963); *see also Free v. Bland,* 369 U.S. 663, 82 S.Ct. 1089, 8 L.Ed.2d 180 (1962). But even where there exists no direct conflict with an express federal regulation, a finding of preemption may be

---

**6.** The court's conclusion on the ripeness issue might be different if there existed some formal federal agency complaint procedure in which the parties might have asserted their claims. *See Bradford School Bus Transit, Inc. v. Chicago Transit Authority,* 537 F.2d 943, 948 (7th Cir. 1976); *Pietroniro v. Borough of Oceanport,* 764 F.2d 976, 980 (3d Cir.1985). Such a procedure does not, however, appear to exist. *See Saddle River Tours, Ltd. v. New Jersey Dep't of Transportation,* Civil No. 83–1776, slip op. at 43 (Oct. 31, 1983).

**7.** The defendants also claim that plaintiffs' claims are at least in part barred on eleventh amendment grounds. While there is some merit in defendants' arguments, the issue warrants only brief consideration because the scope of eleventh amendment immunity in this instance is well settled.

Where, as here, plaintiffs seek prospective injunctive relief, and direct their claims against state officials as opposed to the state itself, those claims are not barred by the eleventh amendment. *See Quern v. Jordan,* 440 U.S. 332, 347, 99 S.Ct. 1139, 1148, 59 L.Ed.2d 358 (1979); *Edelman v. Jordan,* 415 U.S. 651, 667, 94 S.Ct. 1347, 1357, 39 L.Ed.2d 662 (1974); *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). To the extent that plaintiffs directed their request for an injunction directly against the state or an "alter ego" such as New Jersey Transit, however, such a request must, as defendants contend, be denied. *See Saddle River Tours, Ltd. v. New Jersey Dep't of Transportation,* Civil No. 83–1776, slip op. at 22 (D.N.J. Oct. 31, 1983), *aff'd,* 745 F.2d 48 (3d Cir.1984) (concluding that New Jersey Transit is entitled to eleventh amendment immunity as an "alter ego" of the state). Furthermore, because New Jersey Transit's officials were performing discretionary

functions, plaintiffs' request for damages against them would be barred "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Because the officials' actions cannot be said to have violated any such clearly established rights in this case, an award of damages against them would be inappropriate.

**8.** Defendants' initial defense is that the threat of withholding subsidies is not a regulation at all within the meaning of the supremacy clause, since plaintiffs remain free to operate their Route 9 service as long as they are willing to forego the UMTA grant. Plaintiffs respond with considerable logic that defendants' distinction between "regulations" and "conditions" is highly problematical once it is acknowledged that the denial of a subsidy can effectively foreclose an economic actor from competing in a market in which all other market participants are being subsidized. At the same time, however, the Supreme Court has suggested in a number of contexts that the constitution's substantive provisions may apply in a more limited way when the claim involves a denial of government subsidies. *See, e.g., Hughes v. Alexandria Scrap Corp,* 426 U.S. 794, 806–10, 96 S.Ct. 2488, 2496–98, 49 L.Ed.2d 220 (1976); *Maher v. Roe,* 432 U.S. 464, 473–76, 97 S.Ct. 2376, 2382–84, 53 L.Ed.2d 484 (1977); *Reeves, Inc. v. Stake,* 447 U.S. 429, 440 n. 14, 100 S.Ct. 2271, 2279 n. 14, 65 L.Ed.2d 244 (1980). While the court recognizes the difficulty of this issue, it finds it unnecessary to resolve it in this case because of its conclusion that even if defendants' actions are properly defined as "regulations" they do not violate the supremacy clause.

warranted when the state regulation is in actual conflict with the objectives that underlie a federal enactment. Thus, a state regulation must be invalidated if its effect is to discourage conduct that a federal statute or regulation seeks to encourage. *Nash v. Florida Industrial Comm'n,* 389 U.S. 235, 88 S.Ct. 362, 19 L.Ed.2d 438 (1967); *City of Burbank v. Lockheed,* 411 U.S. 624, 93 S.Ct. 1854, 36 L.Ed.2d 547 (1973); *Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977). Finally, even where there exists no federal regulation directly affecting the conduct being regulated by the state, the state's very power to regulate that conduct may be found to be superseded either because the field is thoroughly occupied by a federal regulatory scheme, or because the matters at issue may impinge on such important federal interests, or because Congress has preempted state authority by so stating in express terms. *See Fidelity Federal Savings & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982); *Pacific Gas & Electric Co. v. State Energy Resources & Development Comm'n,* 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1721–22, 75 L.Ed.2d 752 (1982).

In explicating the first test, the Court has stated that "[a] holding of federal exclusion of state law would be inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility." *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217–18, 10 L.Ed.2d 248 (1963). Such would be the case here, for example, if the state permitted plaintiffs to operate on Route 9 only if they charged fares below a certain rate, whereas the ICC conditioned its certificate of convenience and public necessity on the requirement that plaintiffs charge fares above that rate. No such problem presents itself here. Indeed, it is evident that plaintiffs are physically capable of meeting all of the federal requirements which condition the grant of certificates of public convenience and necessity and the same time complying with

New Jersey Transit's prohibitions on the operation of service along certain routes. Thus, there is "no inevitable collision between the two schemes of regulation," *id.* at 143, 83 S.Ct. at 1217, which would warrant a finding of preemption under the first tier of preemption analysis.

■ The court therefore turns to the more detailed investigation into Congressional intent which is required by the next stage of the analysis. In this stage, it is necessary to determine whether New Jersey Transit's attempt to regulate defendants' conduct "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" as it has defined them in the Interstate Commerce Act. *See Florida Avocado Growers,* 373 U.S. at 141, 83 S.Ct. at 1216 (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)); *see also Amalgamated Transit Union, Div. 819 v. Byrne,* 568 F.2d 1025, 1028 (3d Cir. 1977). As the Supreme Court made clear in *Avocado Growers,* 373 U.S. at 141, 83 S.Ct. at 1216, the mere fact that the federal government has issued a certificate of compliance with minimum federal standards is not in itself sufficient to warrant a conclusion that the licensed conduct is immunized from "inconsistent or more demanding state regulation". The court reads these words to mean that plaintiffs' possession of the certificate of public convenience and necessity to operate on Route 9 is not, standing alone, sufficient to bar all state regulation that might impinge on their use of the certificate. *See also Huron Cement Co. v. Detroit,* 362 U.S. 440, 447, 80 S.Ct. 813, 818, 4 L.Ed.2d 852 (1960). Rather, a finding of preemption is warranted only if the state regulation is necessarily in actual conflict with the objectives that underlie the federal government's grant of such a certificate.

Plaintiffs cite a number of provisions in the Interstate Commerce Act to support their claim that it does. For example, they point out that the Congressional Findings and Declaration of Policy in the Bus Regu-

latory Reform Act of 1982 specifically stated:

> Sec. 3.... that State regulation of the motor bus industry has, in certain circumstances, unreasonably burdened interstate commerce; that overly protective regulation has resulted in operating inefficiencies and diminshed price and service competition in the motor bus industry; that the objectives contained in the national transportation policy can best be achieved through greater competition and reduced regulation; that in order to reduce the uncertainty felt by the Nation's motor bus industry and those persons that rely on its services, the Interstate Commerce Commission should be given explicit direction for reduced regulation of the motor bus industry and should do everything within its power to promote competition in the motor bus industry.

Bus Regulatory Reform Act of 1982, Pub.L. 97–261 § 3, 96 Stat. 1102 (1982). Plaintiffs further cite the court to the Senate Report accompanying the Bus Act, which states in more detail the Senate Commerce Committee's dissatisfaction with the fact that the states had imposed significant regulation on the busing industry.

> State regulation is one of several significant factors contributing to th[e] inadequate performance [by passenger bus companies]. State regulatory restrictions on entry, exit and/or service frequency, and slow action by State regulatory commissions on fare increases, often have significant adverse impacts on intercity bus operations. Thus, these actions impose an unreasonable burden on interstate commerce and must be preempted.

H.Rep. No. 97–411, 97th Cong., 2d Sess. 7–8, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2308, 2314–15. Given the clarity with which Congress expressed its adherence to free market concepts in these broad policy statements, plaintiffs claim, defendants' efforts to effect their own concededly anti-competitive policy of minimizing duplicative service must be found invalid.

The court has found upon a more thorough analysis of the matter, however, that to draw from the abovementioned policy statements the meanings which plaintiffs seek would be to paint with too broad a brush. First of all, while plaintiffs attempt to cast the Act in a way that makes it appear to be equally applicable to commuter bus operations as to long distance carriers, the Act's main focus in actuality is to deregulate that aspect of the busing industry which is truly interstate in character. This emphasis becomes evident upon inspection of the more specific provisions of the Act and its legislative history.[9] The Senate Report noted, for example, that the Act was not intended "to hamper the efforts being made by Federal, State and local governments to maintain and increase commuter bus services provided both by public and private carriers", S.Rep. No. 47–411, 97th Cong., 2d Sess. 5, *reprinted in* 1982 U.S.Code Cong. & Ad.News 2308, 2312–13, and the Act itself indicates that it is an aspect of the nation's transportation policy to "provide and maintain commuter bus operations". 49 U.S.C. § 10101(a)(2)(F). To this end, the statute directs the ICC to take any significant adverse effect on commuter bus operations into consideration when authorizing entry into and exit from the intercity bus industry, 49 U.S.C. § 10922(c)(1), (c)(2)(A), or removing operating restrictions on those services that directly compete with commuter bus operations, 49 U.S.C. § 10922(i)(4). Given that the free market policies of the Bus Regulatory Reform Act are so qualified by the terms of the Act itself, there is no necessary conflict between it and defendants' actions here.

Secondly, the concurrent existence of UMTA, with its numerous provisions encouraging state and local planning in the commuter transit sphere, necessarily re-

---

9. *See Note, Federal Deregulation of the Busing Industry: Why is it Not Working in New Jersey?* 7 Seton Hall Leg.J. 186, 203 (1984).

futes any contention that Congress intended to oust state regulation in every area of the mass transit industry. Indeed, it would be anomalous to find a state regulation preempted under one federal law when it is being implemented under the authority, and in furtherance, of another federal law. To the extent that UMTA remains valid law after the Bus Regulatory Reform Act—and there has been no suggestion that the Act was intended to repeal any aspect of UMTA by implication—the states' efforts to conduct the "planning and coordination" of their urban mass transit programs which UMTA encourages remain valid grounds upon which they may exercise some regulatory power over the commuter bus industry. Defendants' affidavits and the minutes of their meetings establish that their actions here were in furtherance of precisely this kind of goal, and plaintiffs do not contest defendants' articulated motive of improving the commuter service along Route 9 by eliminating destructive competition.[10] Since the court concludes that state regulations in furtherance of the goals of UMTA are made permissible by UMTA itself, it declines to find that Congress has "unmistakably ... ordained" them to be preempted by the Interstate Commerce Act at the same time. *Florida Lime*, 373 U.S. at 132, 83 S.Ct. at 1210.

Finally, the court concludes that it would also be inappropriate to find that defendants have violated preemption doctrine under the final aspect of the analysis, that of "federal occupation of the field." Plaintiffs' argument in this regard is that New Jersey Transit may not regulate any service which the ICC has the inherent authority—even if never exercised—to regulate as ancillary to its authority over interstate commerce.[11] Language in a number of Supreme Court cases provides some support for this contention. *See, e.g., Railroad Transfer Services, Inc. v. Chicago*, 386 U.S. 351, 87 S.Ct. 1095, 18 L.Ed.2d 143 (1967); *Chicago v. Atchison, Topeka & Santa Fe R. Co.*, 357 U.S. 77, 78 S.Ct. 1063, 2 L.Ed.2d 1174 (1958); *Castle v. Hayes Freight Lines*, 348 U.S. 61, 75 S.Ct. 191, 99 L.Ed. 68 (1954); *Buck v. Kuykendall*, 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623 (1925).

Other of the Court's decisions make clear, however, that a finding of federal preemption—in the commerce area or elsewhere—should not be lightly inferred. *See, e.g., Huron Portland Cement Co. v. City of Detroit*, 362 U.S. 440, 447, 80 S.Ct. 813, 818, 4 L.Ed.2d 852 (1960); *Buck v. California*, 343 U.S. 99, 102, 72 S.Ct. 502, 504, 96 L.Ed. 775 (1952); *California v. Zook*, 336 U.S. 725, 733, 69 S.Ct. 841, 845, 93 L.Ed. 1005 (1949). In the Court's words, the mere fact that Congress has shown an interest in the field "should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the subject matter permits no other conclusion or that Congress has unmistakably so ordained." *Florida Lime & Avocado Growers*, 373 U.S. at 132,

---

10. The court notes further that notwithstanding the Bus Regulatory Reform Act it remains an aspect of the national policy to "encourage the establishment and maintenance of reasonable rates for transportation, without unreasonable discrimination or unfair or destructive competitive practices." 49 U.S.C. § 10101(a)(1)(D).

11. Although plaintiffs explicitly decline to argue that defendants' actions also violate "dormant commerce clause" principles on the theory that such principles cannot apply here because this is not a case where there is an "absence of congressional action," *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810, 96 S.Ct. 2488, 2498, 49 L.Ed.2d 220 (1976); *see also White v. Massachusetts Council of Construction Employers, Inc.*, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983), their lengthy discussion of the con-trolling cases in that area prompt the court to note in passing that such principles are not violated here because the defendants' actions are rationally related to a legitimate state end, because they do not discriminate against interstate commerce in any apparent way, *see Huron Cement Co. v. Detroit*, 362 U.S. 440, 448, 80 S.Ct. 813, 818, 4 L.Ed.2d 852 (1960); *Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978), and because any incidental regulatory burden on interstate commerce is outweighed by the state's interest in maintaining a coordinated transit system and reducing destructive competition. *See Reeves, Inc. v. Stake*, 447 U.S. 429, 445–46, 100 S.Ct. 2271, 2281–82; *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

83 S.Ct. at 1210. As for the suggestion that Congress "unmistakably ... ordained" that the passenger bus industry should be under exclusive federal control, the court refers once again to the continued viability of those provisions of UMTA which permit, and indeed encourage, local efforts at coordination of mass transit systems. And as for the suggestion that the "nature of the subject matter permits no other conclusion," the court notes that while bus operations which are truly interstate in character might make a strong case for a finding of federal preemption, the inherently local nature of the commuter bus operations to which defendants' restriction applies counsels against giving undue emphasis to federal concerns here. *See Buck v. California,* 343 U.S. 99, 102, 72 S.Ct. 502, 504, 96 L.Ed. 775 (1952); *California v. Zook,* 336 U.S. 725, 728, 69 S.Ct. 841, 842, 93 L.Ed. 1005 (1949). For whereas there exists a clear national interest in deregulating barriers to interstate travel, the regulation of a particular area's commuter services is a matter which is best left largely to the expertise of officials located where those operations lie. Suburban Trails, for example, is a company which operates largely within the State of New Jersey, whose operations are likely understood better by New Jersey's transit authority than they are by any federal agency, and whose particular concerns can be more directly addressed within the New Jersey system of political representation than by its federal counterpart. It would therefore be inappropriate to find that defendants' actions are preempted because of federal occupation of the field.

### 3. *Sherman Act*

Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, prohibits "every contract, combination ... or conspiracy, in restraint of trade or commerce among the several States." Section 2 of the same Act, 15 U.S.C. § 2, makes it unlawful to "monopolize, or attempt to monopolize, or combine to conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States."

Plaintiffs claim that the defendants have violated these provisions not only by eliminating competition on Route 9, but also by generally entering into agreements with private bus companies which avoid competition in route service, by dividing markets, territories and customers among the various companies involved in commuter bus service, and by "refusing to deal" in order to forestall or prevent competition.

■■■ The court finds it unnecessary to address these contentions, however, because it finds that the defendants are immune from antitrust liability under the state action exemption. Since the Supreme Court's decision in *Parker v. Brown,* 317 U.S. 341, 350, 63 S.Ct. 307, 313, 87 L.Ed. 315 (1943), it has been clear that the provisions of the Sherman Act do not apply to the regulatory activities of the states. The Court stated there that:

> We find nothing in the language of the Sherman Act which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.

317 U.S. at 350–51, 63 S.Ct. at 313–14.

Since its decision in *Parker,* the Court has refined the state action exemption such that a state, its agencies, or its subdivisions cannot invoke that exemption unless they meet two criteria. First, the entity must show that the challenged restraint is one "clearly articulated and affirmatively expressed as state policy." *Southern Motor Carriers Rate Conference v. United States,* — U.S. ——, ——, 105 S.Ct. 1721, 1727, 85 L.Ed.2d 36 (1985), (quoting *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980) and *City of Lafayette v. Louisiana Power and Light Co.,* 435 U.S. 389, 410, 98 S.Ct.

1123, 1135, 55 L.Ed.2d 364 (1978) (Opinion of Brennan, J.)). Second, "the State must supervise actively any private anticompetitive conduct." *Southern Motor Carriers*, — U.S. at —, 105 S.Ct. at 1727 (1985), (citing *Midcal Aluminum*, 445 U.S. at 105, 100 S.Ct. at 943).

The first prerequisite to the state action exemption has clearly been met here. Defendants demonstrate that their action was taken pursuant to "clearly articulated and affirmatively expressed state policy" by pointing to numerous provisions in the New Jersey statutes and regulations which indicate that their actions further the purpose of the New Jersey Public Transportation Act of 1979, N.J.Rev.Stat. § 27:25–1 *et seq.* The legislative findings accompanying the Act state for example, that its purpose was to provide "efficient, coordinated, safe and responsive public transportation," and that in the provision of such services, "it is desirable to ... avoid destructive competition." N.J.Rev.Stat. § 27:25–2. The legislature provided further in New Jersey Rev. Stat. 27:25–5(h) that in the operation of New Jersey Transit's facilities, it "may include appropriate and reasonable limitations on competition in order that maximum service may be provided most effi-. ciently to the public." Having given New Jersey Transit the regulatory authority to carry out these policies, the legislature must have contemplated that in some instances New Jersey Transit's provision of transportation would have anti-competitive effects. *See Saddle River Tours, Ltd. v. New Jersey Dep't of Transportation*, Civil No. 83–1776 (D.N.J. Oct. 31, 1983), slip op. at 31, ("[g]iven this broad grant of authority to New Jersey Transit, the state legislature necessarily contemplated that in some instances New Jersey Transit's provision of transportation would have anti-competitive effects."). As for the second criterion established by the Supreme Court's post-*Parker* cases, the Supreme Court's recent opinion in *Town of Hallie v. City of Eau Claire*, — U.S. —, —, 105 S.Ct. 1713, 1720 n. 10, 85 L.Ed.2d 24 (1985) indicates that the requirement of active state supervision is likely inapplicable where the anti-

competitive conduct is by a state agency, as opposed to a private party. In any event, plaintiffs have made no allegation that the defendants' actions have been taken at the behest of, or in order to benefit, any private entity. The court therefore concludes that none of the qualifications which the Court has so far attached to the *Parker* state action exemption precludes its application in this case.

Plaintiffs claim nonetheless that *Parker* should not be applied in this case because the state action exemption should not be held to apply to regulatory actions which come into conflict with the supremacy clause. Their argument essentially is that an invalid policy cannot count as one which permits the invocation of the *Parker* doctrine, whether or not it has in fact been "clearly articulated and affirmatively expressed" by the state. Aside from the fact that the court's discussion in Part 2 establishes that no such irrevocable conflict exists, the court also notes that it finds no reason to engraft this new qualification on the *Parker* doctrine. If the validity of a state regulatory policy is to be called into question because of a claimed conflict with federal law, the proper way to evaluate such a claim is by subjecting it to the preemption analysis that the court has engaged in above. Should the state regulation violate the supremacy clause, it need only be invalidated once, and for that reason. An additional finding of invalidity under the Sherman Act would complicate antitrust analysis without affording any additional protection to the free market principles that the Act was enacted to promote. The court therefore declines to adopt plaintiffs' suggestion that it qualify the state action immunity doctrine with a requirement that the state policy being promoted be shown valid under the supremacy clause before it may be found a permissible anti-competitive regulation under the *Parker* holding.

### 4. *Due Process*

Plaintiffs' final claim, that defendants' acts constitute a deprivation of property without due process, warrants only brief

attention. Plaintiffs' claim is that in denying them the federal subsidies because of their decision to use their ICC-granted certificate of public convenience and necessity along Route 9, the defendants impermissibly engaged in a "taking" of a property right, without affording plaintiffs any procedural protections.

■ As noted by the Supreme Court in its now-familiar two-tier analysis, the fourteenth amendment requires the court to consider first whether there has been a deprivation of a property right. *See Perry v. Sindermann,* 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570 (1972); *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). If so, the court must then determine what process was due the deprived party, depending on the relative interests at stake and with due consideration to the need for administrative or judicial efficiency. *See Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

■ In this case, the court concludes that it need not determine what kind of process would be necessary to protect plaintiffs' interests, for it finds that there has been no deprivation of a protectible property right. It agrees with plaintiffs' contention that an operating license such as theirs can be defined as a property right. *See Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971); *Herz v. Degnan,* 648 F.2d 201 (3d Cir.1981); *Reed v. Village of Shorewood,* 704 F.2d 943 (7th Cir.1983). Plaintiffs' real complaint is not, however, that defendants have deprived them of their licenses or engaged in any action which would prevent them from engaging in the activities authorized by those licenses. Rather, it is that defendants have denied them subsidies to which they believe themselves entitled. Indeed, the true subject of any hearing that this court might order would not be whether plaintiffs have been denied the right to operate pursuant to their certificates, but rather whether it would be fair for defendants to deny them the UMTA fund subsidies. There has not been, nor could there be, any contention on plaintiffs' part that their interest in those subsidies approaches the level of an entitlement. The court therefore finds that plaintiffs have failed to allege the deprivation of a property right which would warrant due process protection.

CONCLUSION

In essence, plaintiffs argue that once the ICC has granted them permission to operate a particular bus route, the state agency charged with allocation of subsidies to bus line companies *must* grant monies to them. The state agency charged with the distribution of such monies has the right to grant it where service is needed and withhold it where it is not. Concededly to withhold funds from a company because the service it intends to offer is already being provided is anti-competitive. However, the state has the right to utilize the limited funds available to it to provide and encourage service where it is needed and deny and discourage it where such service already exists. Nothing in the federal law prohibits the exercise of such discretion; indeed, the limitation on the funds available amply justifies it.

For the foregoing reasons, summary judgment is granted to defendants and denied to plaintiffs.